Sheldon ABEND, dba Authors Research Company, Plaintiff–Appellant,

v.

MCA, INC.; Universal Film Exchange, Inc.; James Stewart; Patricia Hitchcock O'Connell, as Co–Executor of the Estate of Alfred Hitchcock and as Co–Trustee of the Assets of the Estate of Alfred Hitchcock; Samuel Taylor, as Co–Executor of the Estate of Alfred Hitchcock and as Co–Trustee of the Assets of the Estate of Alfred Hitchcock, Defendants–Appellees.

Nos. 87–5780, 87–5833 and 87–5922.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1988.

Decided Dec. 27, 1988.

Peter J. Anderson, Santa Monica, Cal., for plaintiff-appellant.

Louis P. Petrich, Los Angeles, Cal., for defendants-appellees.

Anne R. Grupp, Culver City, Cal., for amicus curiae Turner Entertainment Co.

Stephen A. Kroft, Beverly Hills, Cal., for amicus curiae Columbia Pictures Industries, Inc., etc.

Before PREGERSON and THOMPSON, Circuit Judges, and ROSENBLATT,* District Judge.

PREGERSON, Circuit Judge:

Abend, owner of the renewal copyright on the original story on which the motion picture "Rear Window" was based, brought suit against MCA and the trustees and executors of Alfred Hitchcock's estate and assets. Abend's complaint alleges copyright infringement based on defendants' re-release of the "Rear Window" film in theatres, on TV, and on videocassette. The district court granted defendants' motion for summary judgment based on the Second Circuit's decision in *Rohauer v. Killiam Shows, Inc.*, 551 F.2d 484 (2d Cir.), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), and the "fair use" defense. The district court denied defendants' motion for summary judgment based on alleged defects in the story's copyright and also denied plaintiff's motion for summary judgment as to defendants' liability for copyright infringement. Plaintiff appeals the grant of summary judgment for defendants and the denial of his motion for summary judgment. Defendants cross-appeal the denial of their motion for summary judgment based on alleged defects in the story copyright.

## BACKGROUND

Plaintiff Abend, a literary agent, acquired from Chase Manhattan Bank the renewal copyrights in several stories written by Cornell Woolrich. Chase Manhattan Bank is the executor of Woolrich's estate. One of these stories, "It Had to be Murder," was the basis for the 1954 film "Rear Window." The story was first published in February 1942 in *Dime Detective Maga-*

zine. The magazine had a "blanket copyright" in the name of its publisher, Popular Publications, Inc. On April 6, 1943, Popular Publications assigned any rights it had in the story, except the right of magazine publication, to Woolrich, the author. The assignment was recorded in the U.S. Copyright Office.

In 1945, Woolrich agreed to assign the rights to make motion picture versions of six of his stories, including "It Had to be Murder," to B.G. De Sylva Productions for $9,250. He also agreed to renew the copyrights in the stories at the appropriate time and then assign the same movie rights to De Sylva Productions for the 28–year renewal term. The defendants acquired the movie rights in the story from De Sylva's successors in interest for $10,000.

In 1954, Paramount Pictures produced and distributed "Rear Window," the classic movie version of Woolrich's story "It Had to be Murder." Alfred Hitchcock directed; Grace Kelly and James Stewart starred.

Woolrich died in 1968 without a surviving spouse or child. He left his property to a trust administered by his Executor, Chase Manhattan Bank, for the benefit of Columbia University. On December 29, 1969, Chase Manhattan Bank renewed the copyright in the "It Had to be Murder" story pursuant to 17 U.S.C. § 24. In 1972, Chase Manhattan assigned the renewal copyright to the plaintiff Abend for $650 plus 10% of all proceeds from exploitation of the story.

Meanwhile, the film version had been broadcast on the ABC television network in 1971. Plaintiff Abend at that time notified defendants Alfred Hitchcock, James Stewart, and MCA that Abend owned the copyright renewal, but the defendants nonetheless proceeded to enter into a second license with ABC to rebroadcast the movie. In 1974, Abend filed suit against these same defendants, and others, in the U.S. District Court for the Southern District of New York, alleging copyright infringement. To settle the liability for this al-

---

* Honorable Paul G. Rosenblatt, United States District Judge, District of Arizona, sitting by desig-   nation.

leged infringement, Abend dismissed his complaint in return for $25,000.[1]

Three years later, the Second Circuit handed down its decision in *Rohauer v. Killiam Shows, Inc.*, 551 F.2d 484 (2d Cir.), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). Relying on that decision, defendants authorized Universal Pictures to re-release the film. The re-release involved making new 35 and 16–millimeter prints of the film for theatrical exhibition in the United States, creating videocassettes and videodiscs of the film, and publicly exhibiting the film in theaters, over cable TV, and through videodisc and videocassette rentals and sales. The re-release generated over $12 million in revenue.

Abend brought suit against Alfred Hitchcock, James Stewart, and MCA—the owners of the "Rear Window" film and the renewal copyright in the film—and Universal Film Exchange, the distributor of the film. Abend's complaint alleges that the re-release constitutes copyright infringement. The complaint further alleges that defendants also interfered with the exercise of Abend's renewal rights in other ways. Specifically, Abend contends that he sought to contract with Home Box Office (HBO) to produce a play and TV version of the story, but that defendants wrote him and HBO stating that neither he nor HBO could use either of the titles—"Rear Window" or "It Had To Be Murder." The complaint alleges that defendants further interfered with Abend's renewal copyright by attempting to sell the right to make a TV "sequel." The complaint also alleges that the re-release of the original movie in itself interfered with Abend's ability to produce other derivative works.

The parties filed cross-motions for summary judgment. Defendants initially filed two motions for summary judgment, one based on *Rohauer*, the other based on alleged defects in the story's copyright. Plaintiff moved for summary judgment as to defendants' liability for copyright infringement. Defendants then filed a third

motion for summary judgment based on a "fair use" defense. At the hearing on the motions, the district court granted defendants' motions for summary judgment based on *Rohauer* and the fair use defense. The court denied plaintiff's motion for summary judgment and defendants' motion for summary judgment which alleged defects in the story's copyright. The plaintiff appeals the district court's grant of summary judgment for defendants and the denial of his motion for summary judgment. Defendants have cross-appealed from the district court's denial of their motion for summary judgment based on alleged defects in the story's copyright.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party, to determine if any genuine issues of material fact exist. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). Whether a use of copyrighted material is a "fair use" is a mixed question of law and fact. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985). If the district court found sufficient facts to evaluate each of the statutory factors, the appellate court may decide whether defendants may claim the fair use defense as a matter of law. *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986).

## DISCUSSION

I. *Did a Defective Copyright Notice or Defective Copyright Renewal Place the Rear Window Story In the Public Domain Before 1970?*

   A. Was the Blanket Copyright Notice Defective?

▇▇▇ The parties agree that in 1942 Woolrich conveyed to Popular Publications

---

**1.** The parties both proceed on the assumption that the settlement did not address any of the

issues raised in the current appeal.

the magazine publication rights[2] in Woolrich's story, "It Had to Be Murder." Woolrich, however, retained all other rights in the story. During the same year, Popular Publications registered in its name a blanket copyright for the issue of *Dime Detective Magazine* that contained, as part of its publication, the story, "It Had to Be Murder." Woolrich did not separately register any copyright for the story. Defendants contend that, under these circumstances, "It Had to Be Murder" was ineffectively copyrighted and therefore entered the public domain. We disagree.

We adopt the Second Circuit's conclusion that where a magazine publisher has purchased limited publication rights in a work "under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor [of the work]." *Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 399 (2d Cir.1970).[3]

In *Goodis*, the Second Circuit addressed a factual situation similar to the one in this case. There, the author of a story granted limited rights to the publisher of a periodical. The publisher registered a blanket copyright in the issue of the periodical that contained the story. The author never separately copyrighted his work. *Id.* at 399.

Under these circumstances, the Second Circuit concluded that the publisher's copyright effectively protected the story and gave the author beneficial ownership of a copyright in the story. In so holding, the court decided that the "doctrine of indivisibility" should not be strictly applied to decide who may copyright a work.

The "doctrine of indivisibility" is a label used to describe the idea that a copyright must be held in full by a single proprietor and may not be partially assigned. *See generally* 3 *Nimmer on Copyright* § 10.01, at 10–4 to 10–19 (1988) ("The Doctrine of Indivisibility Under the 1909 Act"). Under the doctrine, a "licensee" of a copyright—i.e., someone who holds only partial copyright privileges—may not copyright a work in the licensee's name. *See Goodis*, 425 F.2d at 400.

If the doctrine were strictly applied to the facts of this case and to the facts of *Goodis*, the publisher's copyright could not protect the author's interest in the story. This is because the publisher, who holds only partial copyright privileges in the story, could not copyright the story in the publisher's name.

The problem with strictly applying the doctrine of indivisibility in the context of magazine publishing is that it "bring[s] about the unnecessarily harsh result of thrusting the author's product into the public domain when, as here, everyone interested … could see [the publisher's] copyright notice and could not have believed there was any intention by [the author] to surrender the fruits of his labor." *Id.* We agree with the Second Circuit that a strict application of the doctrine in this context is not necessary.

As the Second Circuit noted, the doctrine of indivisibility is a judge-made rule that relates primarily to standing. "The most frequently cited policy for applying the indivisibility rule is to avoid multiple infringement actions, each brought by the holder of a particular right in a literary work without joining as co-plaintiff the au-

---

**2.** There is no written record of this conveyance. The parties' agreement is based on evidence presented to the district court. The evidence showed that the custom and practice of the time was for authors to convey to publishers only the right to publish the authors' stories in magazines in North America. All other rights were generally retained by the author. Because this practice was standard, there appears to be no disagreement concerning the character of Woolrich's conveyance of rights to Popular.

**3.** In *Runge v. Lee*, 441 F.2d 579, 581 (9th Cir.), *cert. denied*, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed. 2d 169 (1971), we cited *Goodis* with approval for the proposition that a magazine's copyright of a work gives the author beneficial ownership of a copyright in the work. It is not clear from the facts of *Runge*, however, if the author in that case separately registered a copyright in the work. *See id.* at 580. We therefore do not assume that *Runge* fully adopted the holding of *Goodis*.

thor or proprietor of the copyrighted work." *Id.*

Despite the doctrine's continued usefulness in the area of standing, it is not necessary to apply it to determine who may register a copyright to protect the author of a contribution to a periodical. We agree with the Second Circuit's observation that "the important considerations [for this question] are the intention of the parties to obtain copyright and the adequacy of notice to the public; the characterization of the publisher as assignee or licensee is secondary." *Id.* at 403.

Defendants argue that the Supreme Court's holding in *Mifflin v. R.H. White Co.*, 190 U.S. 260, 23 S.Ct. 769, 47 L.Ed. 1040 (1903), bars our adoption of the Second Circuit's holding. We are persuaded by the Second Circuit's treatment of that opinion. *See Goodis*, 425 F.2d at 401–02.

In *Mifflin*, the Supreme Court held that a copyright in a publisher's name could not protect the author's interest in a story printed by the publisher. 190 U.S. at 264, 23 S.Ct. at 771. In *Mifflin*, the Court was interpreting the requirements of the Copyright Act of 1831, 4 Stat. 436.

The Second Circuit notes that the 1909 Act changed the procedures for copyrighting a work. Before 1909, under the 1831 Act, an author obtained copyright *before publication* by depositing a copy of the title of his work in the district court in the district of his domicile. *Goodis*, 425 F.2d at 401. After 1909, copyright could be obtained *by publishing the work* with notice in conformity with the Act. *Id.* Thus, it was not until after Congress adopted the Copyright Act of 1909 that authors would have reason to assume that "first publication of the work, whether in magazine or book form, would be the means of obtaining copyright." *Id.* at 402. Once the 1909 Act was adopted, it was common for an "author [to] assume[ ] the publisher would attend to copyrighting the work in his be-

half." *Id.* To extend the Supreme Court's pre-1909 holding to publication transactions conducted after 1909 would "provide a trap for the unwary author." *Id.*

Thus, we find that the Second Circuit's position is not barred by earlier precedent and makes sound practical sense.

### B. Was the Renewal Defective?

■ In 1969, the executor of Woolrich's estate renewed the copyright in "It Had to Be Murder" pursuant to section 24 of the 1909 Act. Defendants contend that this renewal was invalid. They interpret section 24 to allow only Popular—the proprietor of the copyright in *Dime Detective Magazine*—to renew the copyright in "It Had to Be Murder," because it was Popular's blanket copyright in the *Magazine* that originally gave copyright protection to the story.[4] Thus, they argue that "It Had to Be Murder" passed into the public domain at the expiration of the original 28–year copyright term when Popular failed to renew the copyright. This contention lacks merit.

The right to renew the copyright in "It Had to Be Murder" is governed exclusively by section 24 of the Copyright Act of 1909, 17 U.S.C. § 24. *See Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 743 (2d Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). Originally, section 24 provided in relevant part:

> [I]n the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work *when such contribution has been separately registered*, the author of such work ... shall be entitled to a renewal ... [or, if the author ... be not living, then the author's executors].

Act of March 4, 1909, c. 320, 35 Stat. 1075 (emphasis added).[5] As originally enacted, section 24 gave authors the right to renew

---

4. This argument assumes a rejection of defendants' previous argument that Popular's blanket copyright of *Dime Detective Magazine* failed to protect "It Had to Be Murder" and placed the story in the public domain.

5. Congress reenacted section 24 as section 304(a) under the new Copyright Act of 1976. *See* 17 U.S.C. § 304(a).

their work, *except*, inter alia,[6] when the work was published under the blanket copyright of a composite work. *See Shapiro, Bernstein & Co. v. Bryan*, 123 F.2d 697, 699 (2d Cir.1941).

In 1940, Congress amended section 24 (then section 23) by deleting the underlined phrase "when such contribution has been separately registered." Act of March 15, 1940, 54 Stat. 51. The issue here is whether section 24 *as amended* gives the author of a contribution to a periodical renewal rights with respect to that contribution, even when the author did not separately copyright the contribution. The legislative history of the 1940 amendment to section 24 leads us to conclude that it does.

The amendment came before Congress twice before it passed.[7] The congressional reports that accompanied the bill on each occasion clearly evince Congress' intent to provide the author of the contribution with a right of renewal. The report that accompanied the bill the first time it went before Congress stated that "[t]he purpose of the bill [is to] ... restore to the author the right he enjoyed prior to July 1, 1937 [the effective date of section 24], to renew directly in his own name any of his contributions whether separately registered or not." S.Rep. No. 1808, 75th Cong., 3d Sess. 2 (1938). *See also* 83 Cong.Rec. 8297 (1938) (remarks of Senator Lodge describing the amendment's goal of providing the author with a right of renewal in his own work).

The second report was less expansive than the first but nonetheless noted:

The primary purpose of this proposed amendment is to make it possible for authors ... to save valuable copyrights from falling into the public domain at the end of the first term of 28 years because the contribution to the periodical was not

separately registered, although protected by the blanket copyright of the issue of the periodical in which it appeared. Many of such copyrights are falling into the public domain from day to day because the proprietor, i.e., the publishing company of the periodical, has gone out of existence, leaving no successor in interest or any legal representative entitled to renew the copyright. This information comes to us through the authors themselves or their agents, who seek to secure renewal, but upon investigation of the original records it turns out that no separate registration of the work in question had been made and consequently the author or his widow, children, etc., are barred under the law as it stands from exercising the renewal privilege.

H.R.Rep. No. 1612, 76th Cong., 3d Sess. 1 (1940). There was no debate or hearing on the amendment. *See* Brylawski, *Renewal of Copyright in a Magazine Contribution: A Belated View*, 42 Geo.Wash.L.Rev. 737, 749 (1974); *see also* 84 Cong.Rec. 7079 (1939).

In light of this legislative history, we think Congress amended section 24 to give authors the right to renew their contributions to composite works, even when the author's contribution had not been separately registered.

No court has directly ruled on this issue, but two courts have noted that the author has the right to renew the copyright in a contribution to a composite work. *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 948 (2d Cir.1975) ("contributors can renew individual contributions"); *Cadence Industries Corp. v. Ringer*, 450 F.Supp. 59, 61 n. 5 (S.D.N.Y.1978) (individual author has right to renew whether or not the copyright in his contribution has been separately registered).

---

6. Section 24 provides that the right of renewal belongs to the proprietor of the copyright, i.e., the entity under whose copyright the work is published, in three other circumstances: when the work is published posthumously, when it is copyrighted by a corporate body, and when it is published by an employer for whom such work is made for hire. *See Shapiro, Bernstein & Co. v. Bryan*, 123 F.2d 697, 699 (2d Cir.1941).

7. The first time the amendment came before Congress, it passed the Senate but Congress adjourned before the amendment could reach the House floor. *See* 83 *Cong.Rec.* 8297 (1938) (amendment passes the Senate); 83 *Cong.Rec.* 8835 (1938) (referred to House Committee); 83 *Cong.Rec.* 9613 (1938) (Congress adjourns six days later).

The Copyright Office also views the author as having a right of renewal in an individual contribution regardless of whether it has been separately copyrighted. *See United States Copyright Office, Compendium of Copyright Practices* § 11.8.3, at 11–23 (1973) ("While the proprietor of a composite work may claim renewal in the work as a whole, the author of an individual contribution, or his beneficiaries, may also claim renewal in his contribution"); *see also United States Copyright Office, Compendium of Copyright Practices* § 1317.05, at 1300–24 (1984) (similarly interpreting Copyright Act of 1976).

Consistent with the plain language of section 24, its legislative history, the views of other courts, and the position of the Register of Copyrights, we hold that section 24 gives the author of a contribution to a periodical a right of renewal with respect to that contribution, even when the author has not separately copyrighted the contribution.

II. *Are Defendants Entitled to Summary Judgment as a Matter of Law Based on the Second Circuit's Decision in Rohauer v. Killiam Shows, Inc.?*

As owner of the renewal copyright in Woolrich's story, "It Had to Be Murder," Abend argues that defendants' re-release of the movie "Rear Window" in theaters, on cable TV, and on videocassette constitutes infringement of the renewal copyright. Defendants argue that they have the right to continue to exploit "Rear Window" during the 28–year renewal period without regard to Abend's ownership of the renewal copyright in the underlying story, "It Had to Be Murder," because Woolrich agreed to assign to defendants' predecessors in interest the motion picture rights in the underlying story for the renewal period. The lawsuit arises because Woolrich died before he could obtain the renewal copyright. To resolve this controversy, we must reconcile two competing interests: the interest of the owner of the renewal copyright in an underlying work, i.e., the story, to exclusive use of that work during the 28–year renewal period, and the interest of the owner of the derivative work, i.e., the film, in its continued exploitation. To do so, we must construe two provisions of the Copyright Act of 1909. 17 U.S.C. §§ 7, 24 (1909 Act).

Section 24 provides that an author or a designated statutory successor (widow, child, or executor) may, within one year prior to the expiration of the original 28–year copyright term, renew the copyright in a work for an additional 28 years. The plaintiff argues that the statutory successor, from whom he acquired the renewal copyright, took the renewal right under section 24 free and clear of any purported assignments of any interest in the renewal copyright, and that defendants' publication and distribution of the "Rear Window" film therefore infringes his renewal copyright.

Defendants argue that Woolrich's earlier consent to the creation of the movie "Rear Window" and his agreement to assign motion picture rights in the story for the renewal period to their predecessors in interest, once renewal had been accomplished, gives them the right to continue to exhibit the film during the renewal period, even though the author died before effecting renewal of the copyright. To support their position, defendants rely on section 7 of the 1909 Act, 17 U.S.C. § 7 (1909 Act), which gives limited copyright protection to derivative works such as a motion picture based on the underlying copyrighted story. Section 7 states that:

> Compilations or abridgments, adaptations, arrangements, *dramatizations*, translations, or other versions of works in the public domain or *of copyrighted works when produced with the consent of the proprietor of the copyright in such works ... shall be regarded as new works [i.e. a derivative work] subject to copyright under the provisions of this title;* but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed ... or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

17 U.S.C. § 7 (1909 Act). (Emphasis added.)

Defendants and the district court both rely primarily on the Second Circuit's decision in *Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484 (2d Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), which held that statutory successors to the renewal copyright in an underlying work under section 24 could not "deprive[ ] the proprietor of the derivative copyright of a right, stemming from the § 7 'consent' of the original proprietor of the underlying work, to use so much of the underlying copyrighted work as already has been embodied in the copyrighted derivative work, as a matter of copyright law." *Id.* at 492. For the reasons set forth below, we reject this conclusion.

### The Rohauer Decision

*Rohauer* involved the 1926 movie, "The Son of the Sheik," based on a novel written by Edith Maude Hull. Hull obtained the copyright in the novel in 1925, and subsequently assigned the motion picture rights to Moskowitz. Hull also agreed to renew the copyright and assign the motion picture rights during the renewal term to the purchaser Moskowitz. *Id.* at 486. In 1926, a movie based on Hull's story was produced and copyrighted. The owners of the movie renewed the derivative copyright *on the movie* in 1954, and in 1961 sold this copyright to Gregstan Enterprises, Inc., a corporation headed by Paul Killiam. Gregstan assigned the renewal copyright to defendant Killiam Shows, Inc. in 1968. Mrs. Hull died in 1943. Her daughter renewed the underlying copyright *on the novel* in 1952 under section 24, and, in 1965, assigned the movie and television rights to Rohauer. On July 13, 1971, the original movie aired on WNET, the New York public television station, using a tape made from a print obtained from defendant Killiam Shows. Rohauer sued for copyright infringement. *Id.* at 486–87.

### 1. Reconciling Sections 7 and 24

Judge Friendly, writing for the Second Circuit, saw his task as reconciling the first clause of section 7, which grants copyright protection to derivative works, with the section 24 provision for renewal of the underlying copyright. In *Rohauer,* the Second Circuit found that no prior cases addressed this question, and then relied on the "new property right" theory propounded in *Edmonds v. Stern,* 248 F. 897 (2d Cir.1918), and on the relative "equities" to hold that defendants' broadcast of the "Son of the Sheik" movie did not infringe the renewal copyright in the underlying novel. *Rohauer,* 551 F.2d at 490–93.

In *Edmonds v. Stern,* the Second Circuit held that the owners of a derivative copyright in an orchestral arrangement of a song had a property right "wholly separate and independent" from the property right in the underlying song. 248 F. at 898. According to the court, when the author of the original work gave consent to the creation of a derivative work, "a right of property sprang into existence, not at all affected by the conveyance of any other right." *Id.* The Second Circuit in *Rohauer* viewed its holding as "only a slight extension" of the *Edmonds* decision. 551 F.2d at 492.

Abend argues that *Rohauer's* adoption of the new property right theory to reconcile sections 7 and 24 violates the traditional rule that "a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work." *Russell v. Price,* 612 F.2d 1123, 1128 (9th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). Shortly before *Rohauer,* the Second Circuit affirmed the traditional rule in *Gilliam v. American Broadcasting Co.,* 538 F.2d 14 (2d Cir. 1976). In *Gilliam,* plaintiffs, a group of writers and performers, sought to enjoin ABC from broadcasting edited versions of programs that plaintiffs had written and performed for broadcast by BBC. The scriptwriters' agreement between plaintiffs and BBC gave the plaintiffs maximum control over the script and precluded BBC from altering a program once it was recorded. *Id.* at 17. BBC licensed the programs to Time Life Inc. for distribution, which in turn entered into an agreement

with ABC for broadcast of the programs. Prior to broadcast, the programs were severely edited. Plaintiffs described the editing as "mutilation." *Id.* at 18. They successfully argued that the editing of the program—the derivative work—infringed plaintiffs' copyright in their script—the underlying work. The court held that section 7 provided protection for the derivative work, so long as it did not affect the "force or validity" of the underlying copyright. But, according to the Second Circuit in *Gilliam,* ownership of the derivative copyright does *not* carry with it the right to "affect the *scope* or ownership of the copyright in the underlying script." *Id.* at 20 (emphasis added). The Second Circuit in *Gilliam* firmly declared that "the ability of the copyright holder to control his work remains paramount in our copyright law."[8] *Id.* at 21.

Abend also contends that *Rohauer's* adoption of the "new property right" theory fails adequately to distinguish precedent, particularly *G. Ricordi & Co. v. Paramount Pictures Inc.,* 189 F.2d 469 (2d Cir.), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951).[9] In *Ricordi,* Long, the author of the novel *Madame Butterfly,* authorized Belasco to write a play based on the novel. Both Long and Belasco subsequently assigned the right to make an opera based on the play to the plaintiff Ricordi. In 1904, Ricordi copyrighted the opera. Later Ricordi obtained the renewal rights to the opera. Long renewed the copyright in his novel in 1925, and, before his death,

assigned the movie rights to Paramount, the defendant. At the same time, Paramount acquired from Belasco's trustee the movie rights to the play. Belasco had never effected renewal of the play's copyright. Ricordi sued for a declaration that he was entitled to produce a movie of the opera. The court held that Ricordi's interest extended only to "what was copyrightable as new matter in its operatic version." *Ricordi,* 189 F.2d at 471. According to the court, "[a] copyright renewal creates a new estate, and ... the new estate is clear of all rights, interests or licenses granted under the original copyright." *Id.* Thus, Ricordi acquired no rights under author Long's renewal, which was clear of all rights granted under the original copyright, and therefore Ricordi could not "make general use of the novel for a motion picture version of Long's copyrighted story...." *Id.*

Abend argues that under *Ricordi,* a renewal copyright creates a new estate that cuts off any rights acquired during the original term of the copyright. *Rohauer,* however, found *Ricordi* distinguishable for a "fundamental reason:" in *Ricordi,* the agreement between the authors and the plaintiff did not purport to extend beyond the original term of Long's copyright; Ricordi had never bargained for any rights in the renewal term.[10] *Rohauer,* 551 F.2d at 491. By contrast, in both *Rohauer* and the case before us, the authors clearly agreed to assign the motion picture rights to the

---

**8.** The parties dispute what effect, if any, section 7's provision that the publication of a derivative work "shall not affect the force or validity" of the copyright on the underlying work has on this case. Abend argues that the defendants' exploitation of the "Rear Window" film impairs the "force or validity" of the copyright in the underlying story in violation of section 7. Defendants argue that section 7's "force or validity clause" was not intended to apply to this situation at all. *Rohauer* supports the defendants' argument. In *Rohauer,* the Second Circuit stated that the "force or validity clause" had no bearing on the issue presented. *Rohauer,* 551 F.2d at 489–80. Because we hold that this case is controlled by the Supreme Court's decision in *Miller Music Corp. v. Charles N. Daniels, Inc.,* 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960), which held that statutory successors to renewal

copyrights take free and clear of all purported assignments of the renewal right when the author dies before effecting renewal, we need not decide whether or how section 7's "force or validity" clause bears on this issue.

**9.** Nimmer argues that the Second Circuit at least twice repudiated the new property right theory—before *Rohauer* in *Ricordi,* after it in *Gilliam.* 1 Nimmer § 3.07[A] at 3–24. *See also Russell v. Price,* 612 F.2d at 1127 n. 13 ("the so-called 'new property rights' theory which [*Rohauer*] ... seems partially to adopt, had been consistently rejected in earlier decisions....").

**10.** *Rohauer* distinguished *Fitch v. Shubert,* 20 F.Supp. 314 (S.D.N.Y.1937), on the same ground.

owners of the derivative work during the renewal term. *Id.*

We find the distinction between *Ricordi* and *Rohauer* unconvincing because in both situations there is no *effective* grant of motion picture rights to make a derivative work during the renewal term. In *Ricordi,* no grant existed because the parties never included renewal rights in the agreement. In *Rohauer* and our case, the agreements evidenced the intention of each author to assign renewal rights, but renewal rights never vested in either author because each died before the time for renewal accrued, i.e. one year prior to the expiration of the original term. In *Miller Music Corp. v. Charles N. Daniels, Inc.,* 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960), the Supreme Court held that an assignment of full copyright renewal rights by the author *prior* to the time for renewal—i.e. within one year prior to the expiration of the original 28–year copyright term—*cannot* defeat the right of the author's statutory successor to the renewal copyright when the author dies before the time that the right for renewal has accrued. In *Miller Music,* Black and Daniels composed a song and assigned all rights in it to Villa Moret, Inc., which obtained the original copyright. Before the time when renewal rights accrued, Black assigned his *renewal rights* to Miller Music. Black died before he could effect renewal. His brother became executor and renewed the copyright under section 24, and Daniels ultimately acquired the renewal copyright from Black's brother. Miller Music sued Daniels for infringement. The Supreme Court held for Daniels, stating that "the next of kin obtains the renewal copyright free of any claim founded upon an assignment made by the author in his lifetime. These results follow not because the author's assignment is invalid but because he had only an expectancy to assign...." [11] *Id.* 362 U.S. at 375, 80 S.Ct. at 794. The Court held that section

24 creates contingency interests, and that "[u]ntil [the renewal period] arrives, assignees of renewal rights take the risk that the rights acquired may never vest in their assignors. A purchaser of such an interest is deprived of nothing. Like all purchasers of contingent interests, he takes subject to the possibility that the contingency may not occur." *Id.* at 378, 80 S.Ct. at 796.[12]

*Miller Music* provides ineluctable authority for Abend's position. Since Woolrich died before the renewal period arrived, his purported assignment of renewal rights is ineffective and irrelevant; the most defendants' predecessors could have acquired was an expectancy in the right to use the story that underlies the derivative work during the story's renewal period. The distinction *Rohauer* draws between cases where the author never agreed to assign renewal rights, like *Ricordi* and *Fitch v. Shubert,* 20 F.Supp. 314 (S.D.N.Y.1937), and cases like ours, where the author's agreement is plainly unenforceable against his statutory successors, is meaningless. *Accord* 1 *Nimmer on Copyright* § 3.07[A], at 3–28, 3–29; *see also Mills Music, Inc. v. Snyder,* 469 U.S. 153, 183 n. 8, 105 S.Ct. 638, 655, 83 L.Ed.2d 556 (1985) (White, J., dissenting) ("If an author had assigned his rights in the renewal term at the time that he assigned rights in the initial term, a grantee might safely release a derivative work prepared under authority of the first-term grant. But if the author had died before his renewal rights vested, his statutory successors acquired those rights, and any previous assignment was rendered null." (Citations omitted.)).

Rohauer virtually ignores *Miller Music.* It dismisses *Miller Music* by stating merely that *Miller Music* and other Supreme Court cases "were concerned with the relative rights of persons claiming full assignment or ownership of the renewal term of an underlying copyright," rather than with

---

**11.** Of course, in this case, had Woolrich lived until the time for renewal arrived, Paramount could have enforced his agreement to assign to it the motion picture rights in the renewal copyright. *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 657, 63 S.Ct. 773, 779, 87 L.Ed. 1055 (1943).

**12.** The Court concluded by noting that "[w]hether it works at times an injustice is a matter for the Congress, not for us." *Miller Music,* 362 U.S. at 378, 80 S.Ct. at 796.

the competing rights of the owner of a renewal copyright in the underlying work and the owner of the copyright in the derivative work. *Rohauer,* 551 F.2d at 490. The *Rohauer* court fails to explain why this distinction rendered *Miller Music* irrelevant to the case before it.[13] In our view, the fact that *Miller Music* involved competing claims to the underlying copyright weakens defendants' argument. If *Miller Music* makes assignment of the full renewal rights in the underlying copyright unenforceable when the author dies before effecting renewal of the copyright, then, *a fortiori,* an assignment of part of the rights in the underlying work, the right to produce a movie version, must also be unenforceable if the author dies before effecting renewal of the underlying copyright.

The legislative history behind section 24 lends further support to Abend's position and the Supreme Court's decision in *Miller Music.*. In Hearings before the Committees on Patents on the Proposed Copyright Act, Mr. W.B. Hale, representative of the American Law Book Company, discussed the problem of obtaining renewal rights from joint authors of composite works. He testified that:

it is only possible to cover the right of renewal of the actual author. The right of renewal is contingent. It does not vest until the end. If he is alive at the time of renewal, then the original con-

tract may pass it, but his widow or children or other persons entitled would not be bound by that contract.

*Legislative History of the 1909 Copyright Act* K77 (E. Brylawski A. Goldman eds. 1976). Congress understood that the renewal right provided by section 24 was to be contingent. Because the contingent nature of the renewal right would cause hardship to owners of composite works, Congress exempted composite works from this aspect of the renewal provision in the 1909 Act. *See* 17 U.S.C. § 24. Significantly, Congress did *not* include a similar exemption for derivative works.[14]

2. The Equities and the 1976 Act

The *Rohauer* decision and defendants' position ultimately rest on policy considerations. *Rohauer* found that "the equities lie preponderantly in favor of the proprietor of the derivative copyright." *Rohauer,* 551 F.2d at 493. *Rohauer* correctly observes that "[i]n contrast to the situation where an assignee or licensee has done nothing more than print, publicize and distribute a copyrighted story or novel, a person who with the consent of the author has created an opera or a motion picture film will often have made contributions literary, musical and economic, as great as or greater than the original author." *Id.* The court's own words, however, reveal the flaw in its analysis: the "greater contribu-

---

**13.** The defendants here do little better with respect to the case before us. They add only that the Supreme Court "may want to reconsider *Miller Music.*"

**14.** The dissent seeks to distinguish the facts in the instant case and the facts in *Rohauer* from cases such as *Miller Music* and *Russell* by arguing that the instant case and *Rohauer* involve two copyrighted works—the underlying work and the derivative work—whereas *Miller Music* and *Russell* involve only one copyrighted work. Dissent at 1484. This distinction is not relevant because the critical inquiry is the extent of the defendants' copyright in the derivative work. We recognize that the defendants are entitled to use the "new matter" contained in the derivative work. We conclude, however, based on well-settled principles of copyright law articulated in *Miller Music, Russell,* and the other cases cited above, that the defendants do not have the unrestricted right to use the "old matter" in the derivative work (i.e., the material taken from

the underlying work) during the underlying work's copyright renewal period.

The defendants only have two potential bases for their claimed right to use the "old matter" during the copyright renewal period of the underlying work. First, they might argue that the right was transferred to their predecessors by the predecessors of the plaintiffs. As we demonstrate above, the rule articulated by the Supreme Court in *Miller* leads to the conclusion that the predecessors of the plaintiffs did not succeed in transferring the disputed right to the predecessors of the defendants. *See supra* at 1473. Second, they might claim the disputed right on the basis of the original copyrighting of the derivative work by their predecessors. We have shown, however, that the traditional copyright rule provides that a derivative copyright protects only the "new matter" contained in the derivative work, not the "old matter." *See supra* at 1475–76 (citing *Russell, Gilliam,* and *Ricordi*).

tion" theory can cut both ways. While the creators of the "Rear Window" movie clearly made substantial and costly contributions to the underlying work, other derivative works protected by the *Rohauer* rule might involve only minimal contributions to the underlying work. Consequently, this rationale alone cannot justify *Rohauer's* holding.

*Rohauer's* second equity consideration is the inability of the purchaser of the derivative copyright "to protect himself against the eventuality of the author's death before the renewal period" since the author's statutory successors could not be definitely ascertained until that date.[15] *Id.* Again, the Second Circuit raises a legitimate concern, but one the Supreme Court apparently rejected in *Miller Music.* That case put assignees of copyright renewal rights on notice that they were acquiring only a contingent interest, with the risk that the interest might not vest. *Miller Music,* 362 U.S. at 375, 80 S.Ct. at 794.

Moreover, *Rohauer's* exclusive focus on potential unfairness to makers of derivative works overlooks important policies behind section 24 that favor the author. Congress enacted section 24 for two specific purposes. First, Congress sought to provide authors with a "second chance" to reap the benefits of their work, particularly since authors must often negotiate from an unequal bargaining position.[16] Congress recognized that "not infrequently ... the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years ... it should be the exclusive right of the author to take the renewal term...." *Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 654, 63 S.Ct. 773, 778, 87 L.Ed. 1055 (1943) (quoting H.Rep. 2222, 60th Cong., 2d Sess., pp. 14–15).

This concern is more compelling in the case before us. The infringement in *Rohauer* consisted of making one videotaped copy of a print of the film and broadcasting it over a public television station. This case, by contrast, involves a nationwide re-release of the film in theatres, in the video-cassette sales and rental markets, and on cable TV. Clearly, when Woolrich agreed to assign his renewal rights, he could not have foreseen the technological advances which have enabled the authors of the derivative work to expand tremendously their exploitation of the film. This development highlights the policy motivating section 24: Congress' desire to give authors a "second chance" to make a better deal. To the extent *Rohauer* depends on equitable considerations, its failure to consider the author's interests under section 24 makes the *Rohauer* result even more problematic.

Second, by enacting section 24, Congress intended to provide protection to the author's family and so extended the renewal right to include the author's surviving family or heirs, should the author die during the original term of the copyright. Section 24 in essence acts as a "compulsory bequest of the copyright to the designated persons." *De Sylva v. Ballentine,* 351 U.S. 570, 584, 76 S.Ct. 974, 982, 100 L.Ed. 1415 (1956). In balancing the equities in favor of the derivative copyright owner, *Rohauer* never discusses either of these concerns underlying section 24.

Instead, *Rohauer* looked to the 1976 Copyright Act to support its balancing of the equities. The 1976 Act replaced the two-term scheme established under the 1909 Act with a single term of copyright protection that would last for the life of the author plus fifty years. 17 U.S.C. § 302. This single term, however, applied only to

---

**15.** Defendants and amici argue that this risk will lead producers to withdraw films from distribution to avoid infringing the copyright in the underlying work. The public will then be denied access to countless classic films. Defendants' and amici's dire prediction, however, seems remote. More likely, owners of the renewal copyright and producers will reach a mutually beneficial financial arrangement

which will ensure continued public access to the films.

**16.** Congressional recognition of the need for this protection of authors undercuts *Rohauer's* assertion that authors can protect their heirs by limiting the terms of the assignment. *Rohauer,* 551 F.2d at 493–94.

works copyrighted after its effective date, January 1, 1978. For works in copyright prior to that date, the two-term renewal system remained in effect. 17 U.S.C. § 304.

The 1976 Act also provided for an additional 19–year extension for existing renewal copyrights, subject to the right of the author at the end of the 28th year of the original renewal term to terminate any grants or licenses. However, the 1976 Act included an exception for derivative works. The author's right to terminate prior grants or licences for the 19–year extension period does not apply to existing derivative works for which the author had *granted 28–year renewal rights.* 17 U.S.C. § 304(c)(6)(A).

*Rohauer* viewed this exception as evidence of Congress' intent to give "special protection" to derivative works. *Rohauer,* 551 F.2d at 494. While Congress may, indeed, have intended section 304(c)(6)(A) to provide additional protection in 1976, Congress' intent regarding the 1976 Act does not shed any light on the meaning of the 1909 Act. By its terms, section 304 only applies to the additional 19–year period. Abend persuasively argues that *Rohauer* thus does what Congress declined to do— apply the termination exception retroactively to the 28–year renewal period. When Congress enacted the 1976 Act, the prevailing view was that the owners of the renewal copyright in the underlying story could "veto" the continued use of the derivative work.[17] *Mills Music,* 469 U.S. at 183, 105 S.Ct. at 655 (White, J., dissenting). We can reasonably presume that Congress

knew of this prevailing view when it enacted the 1976 Act and chose not to alter the balance. *Cf. Mills Music,* 469 U.S. at 172, 105 S.Ct. at 649.

Neither the equities, precedent, nor Congressional intent justify us in changing the balance between owners of renewal copyrights in underlying works and owners of the copyright in derivative works when Congress has refrained from doing so. We therefore hold that defendants' continued exploitation of the "Rear Window" film without Abend's consent violates Abend's renewal copyright in the underlying story "It Had to Be Murder," unless the defendants can establish any affirmative defenses.[18]

Our holding does not mean, however, that the equities of this case have no bearing on its outcome. We are mindful that this case presents compelling equitable considerations which should be taken into account by the district court in fashioning an appropriate remedy in the event defendants fail to establish any equitable defenses. Defendants invested substantial money, effort, and talent in creating the "Rear Window" film. Clearly the tremendous success of that venture initially and upon re-release is attributable in significant measure to, inter alia, the outstanding performances of its stars—Grace Kelly and James Stewart—and the brilliant directing of Alfred Hitchcock. The district court must recognize this contribution in determining Abend's remedy.

The district court may choose from several available remedies for the in-

**17.** Defendants argue that in Justice White's discussion of the 1909 Act, he and the three Justices who concurred in his dissent "approved" of *Rohauer. See Mills Music,* 469 U.S. at 183 n. 7, 105 S.Ct. at 655 n. 7. Defendants overstate the case. In the footnote to which defendants refer, Justice White provides support for his statements regarding the renewal rights veto power over continued use of derivative works. Describing this view as the "broad interpretation," Justice White cites *Rohauer* in concluding that "[a] narrower interpretation eventually prevailed, but not until after passage of the 1976 Act." *Id.* This comment indicates neither approval nor disapproval by those four Justices. Nor does it carry much weight as an observation. In the text of the dissent, Justice White

accepts as the "prevailing *understanding"* that the owner of renewal rights had "veto power" over continued use of a derivative work. *Id.* at 183, 105 S.Ct. at 655.

**18.** For the reasons discussed in the next section, we hold that defendants cannot characterize their use of the underlying story as a "fair use" to avoid liability for infringement. Defendants raise other equitable defenses to Abend's infringement action, in addition to fair use. Because defendants have not had the opportunity to present these other defenses fully, *see* discussion at IV, *infra,* the district court should consider these defenses on remand.

fringement. Abend seeks first an injunction against the continued exploitation of the "Rear Window" film. 17 U.S.C. § 502(a) provides that the court *"may . . .* grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."[19] Defendants argue (in an attempt to persuade us to accept *Rohauer*) that a finding of infringement presumptively entitles the plaintiff to an injunction, citing Professor Nimmer. *See* 3 M. Nimmer, *Nimmer on Copyright* § 14.06[B] at 14-55 to 14-56.2 (1988). However, Professor Nimmer also states that "where great public injury would be worked by an injunction, the courts might . . . award damages or a continuing royalty instead of an injunction in such special circumstances." *Id.* at 14-56.2.

We believe such special circumstances exist here. The "Rear Window" film resulted from the collaborative efforts of many talented individuals other than Cornell Woolrich, the author of the underlying story. The success of the movie resulted in large part from factors completely unrelated to the underlying story, "It Had To Be Murder." It would cause a great injustice for the owners of the film if the court enjoined them from further exhibition of the movie. An injunction would also effectively foreclose defendants from enjoying legitimate profits derived from exploitation of the "new matter" comprising the derivative work, which is given express copyright protection by section 7 of the 1909 Act. Since defendants could not possibly separate out the "new matter" from the underlying work, their right to enjoy the renewal copyright *in the derivative work* would be rendered meaningless by the grant of an injunction. We also note that an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come.

This is not the first time we have recognized that an injunction may be an inappropriate remedy for copyright infringement. In *Universal City Studios v. Sony Corp.*

*of Amer.,* 659 F.2d 963, 976 (9th Cir.1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), we stated that Professor Nimmer's suggestion of damages or a continuing royalty would constitute an acceptable resolution for infringement caused by in-home taping of television programs by VCR—"time-shifting." *See also Sony Corp. v. Universal City Studios,* 464 U.S. 417, 499–500, 104 S.Ct. 774, 817–18, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting).

As the district court pointed out in the *Sony* case, an injunction is a "harsh and drastic" discretionary remedy, never an absolute right. *Universal City Studios v. Sony Corp. of Amer.,* 480 F.Supp. 429, 463, 464 (C.D.Cal.1979), *rev'd on other grounds,* 659 F.2d 963 (9th Cir.1981), *reversed* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Abend argues nonetheless that defendants' attempts to interfere with his production of new derivative works can only be remedied by an injunction. We disagree. Abend has not shown irreparable injury which would justify imposing the severe remedy of an injunction on defendants. Abend can be compensated adequately for the infringement by monetary compensation. 17 U.S.C. § 504(b) provides that the copyright owner can recover actual damages and "any profits of the infringement that are *attributable to the infringement* and are not taken into account in computing the actual damages." (Emphasis added.)

█ The district court is capable of calculating damages caused to the fair market value of plaintiff's story by the re-release of the film. Any impairment of Abend's ability to produce new derivative works based on the story would be reflected in the calculation of the damage to the fair market value of the story. In *Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 827 (9th Cir.1985), for example, the plaintiff presented evidence that defendants' unauthorized use of part of

---

19. We apply the remedy provisions of the 1976 Copyright Act because the infringement occurred after 1977. *See Walt Disney Prods. v. Air*

*Pirates,* 581 F.2d 751, 754 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

plaintiff's song in a commercial had "destroyed the value of the copyrighted work" to other advertisers. We held that the plaintiff could recover this lost value as damages. *Id.* at 827–28.

In addition to actual damages suffered, Abend would be entitled to profits attributable to the infringement. 17 U.S.C. § 504(b). Defendants' fear that Abend could receive 100% of their profits is unfounded. Abend can receive only the profits attributable to the infringement. *Id.; Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 518 (9th Cir. 1985) ("When an infringer's profits are attributable to factors in addition to use of [its] work, an apportionment of profits is proper."). Should the court find infringement because defendants have failed to establish any affirmative defenses, on remand it must apportion damages.

While apportioning profits is not always an easy task in these cases, neither is it a new or unusual one. In the landmark case of *Sheldon v. Metro–Goldwyn–Mayer Pictures Corp.,* 106 F.2d 45 (2d Cir.1939), *aff'd,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940), Judge Learned Hand held that profits should be apportioned between the plaintiff and defendants, after finding that defendants' movie "Letty Lynton" infringed plaintiff's play "Dishonored Lady." *Sheldon,* 309 U.S. at 396, 60 S.Ct. at 682. Judge Hand recognized that "no real standard" can govern this apportionment, but he "resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share." *Sheldon,* 106 F.2d at 51. The court then set plaintiffs' share of the profits at 20%, to "favor the plaintiffs in every reasonable chance of error." *Id.*

We likewise recognize that courts cannot be expected to determine with "mathematical exactness" an apportionment of profits. We require only a "reasonable and just apportionment." *Frank Music Corp.,* 772 F.2d at 518. In *Frank,* the defendants infringed plaintiff's copyright in the play "Kismet" by including parts of songs and six minutes of music from the play, and by

using similar characters and setting in Act IV of a musical review entitled "Hallelujah Hollywood." *Id.* at 510. We remanded to the district court for apportionment of profits using a reasonable formula.

We also required apportionment in *Cream Records,* 754 F.2d at 828. In *Cream,* the plaintiff, owner of the copyright in "The Theme From Shaft," sought to recover all profits earned from a commercial produced by the defendants which infringed plaintiff's copyright by using a ten note ostinato from the song. *Id.* We held that "[i]n cases such as this where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard, it is the duty of the court to make some apportionment." *Id.* at 828–29 (quoting *Orgel v. Clark Boardman Co.,* 301 F.2d 119, 121 (2d Cir.), *cert. denied,* 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962).

Because factors other than Woolrich's story clearly contributed to "Rear Window's" success, should the district court find that the defendants have failed to establish any affirmative defense to the infringement, the district court should award Abend actual damages and apportion profits between Abend and the defendants. We turn now to the defenses raised by defendants.

### III. *Is the Defendants' Use of the Underlying Work a "Fair Use"?*

■ Defendants argue that if we do not affirm the district court's grant of summary judgment based on *Rohauer,* we should do so on the alternative ground relied on by the district court—that use of the copyrighted story was a "fair use." We conclude, however, that the district court erred in holding that the defendants' use was fair.

Under 17 U.S.C. § 107, certain unauthorized uses of a copyrighted work are not infringing. These uses are termed "fair uses." Section 107 does not set forth a clear test for determining when a use is a "fair use." Rather, it identifies four non-

exclusive factors that the court must consider:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

In applying the first factor, the Supreme Court has held that "every [unauthorized] commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. v. Universal Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). The defendants argue that their distribution of the "Rear Window" film serves an educational purpose, rather than a commercial one. They offer no authority, however, for the bold proposition that a work's popularity may make its value educational rather than commercial. Clearly, the defendants' "use is of a commercial nature." 17 U.S.C. § 107(1).

The second factor that we must consider is the nature of the copyrighted work. A use is less likely to be deemed fair when the copyrighted work is a creative product. *See, e.g., Brewer v. Hustler Magazine, Inc.,* 749 F.2d 527, 529 (9th Cir.1984) (citing *Sony Corp.,* 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40); *see also* 3 *Nimmer on Copyright* § 13.05[A] at 13–77 ("[C]opyright protection is narrower, and the corresponding application of the fair use defense greater, in the case of factual works than in the case of works of fiction or fantasy."). Here, the copyrighted work is a fictional short story: a quintessentially creative product. This factor, therefore, militates against a finding of fair use.

The third factor is the amount of the portion used in proportion to the entire copyrighted work. It is undisputed that the "Rear Window" film was based on the underlying story, "It Had To Be Murder." Although it is not entirely clear how much of the story was used in the film, Alfred Hitchcock testified in his deposition that the film was at least "20 percent Cornell Woolrich."

We have held that "[o]ne cannot copy the substance of another's work without infringing his copyright." *Benny v. Loew's Inc.,* 239 F.2d 532, 537 (9th Cir.1956) (television burlesque of copyrighted motion picture is not a fair use), *aff'd by an equally divided court sub nom. Columbia Broadcasting System v. Loew's,* 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958). Recently, we noted that the Supreme Court's decision in *Sony* "casts doubt on [this court's] previous pronouncements concerning wholesale copying as an absolute preclusion to fair use." *Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1155 (9th Cir.1986) (Pregerson, J.). In *Sony,* however, the Supreme Court merely held that "time-shifting"—making a video-tape copy of a television broadcast for viewing at a later time—was a fair use. *Sony* does not stand for the proposition that wholesale copying for a purely commercial purpose may ever be a fair use. Indeed, in *Harper & Row* the Supreme Court held that the unauthorized quotation of an insubstantial portion of an unpublished manuscript was not a fair use when the quotation "took what was essentially the heart of the book." 105 S.Ct. at 2233 (citation omitted).

Here, a substantial portion of the underlying story, "It Had To Be Murder," was used in the "Rear Window" film. Even if the film did not take "what was essentially the heart of the [story]," we conclude, based on our application of the other four statutory factors, that the defendants' use was not a fair use.

The fourth factor that we must consider is the effect of the use on the potential market for the copyrighted work. Nimmer terms this factor "the most important, and indeed, central fair use factor." 3 *Nimmer on Copyright* § 13.05[A] at 13–80. To illustrate the application of this factor, Nimmer posits a hypothetical in which an unauthorized motion picture is made based on a

copyrighted novel. Although the motion picture will have no adverse effect on bookstore sales of the novel—and may in fact have a beneficial effect—it is "clear that [the film's producer] may not invoke the defense of fair use." 3 *Nimmer on Copyright* § 13.05[B] at 13–84. Nimmer explains that although the film will not prejudice the novel's sale in the book medium, it will prejudice its sale in the motion picture medium. *Id.* "If the defendant's work adversely affects the value of any of the rights in the copyrighted work (in this case the adaptation right) the use is not fair even if the rights thus affected have not as yet been exercised by the plaintiff." *Id* at 13–84—13–85 (footnotes omitted).

Here, there is no question that the adaptation rights were adversely affected by the defendants' re-release and distribution of the "Rear Window" film. Abend stated in his declaration that he was interested in obtaining the rights to the underlying story, "It Had To Be Murder," because he thought that it should be republished, and because he thought that it could be remade for United States television. Counsel for the defendants conceded at oral argument that Abend's plans for a remake were frustrated by the existence of the "Rear Window" film. Explaining why HBO abandoned a project to remake the story into a film, counsel for the defendants stated: "It's not hard to figure out when you compare the underlying work with our movie." Under Nimmer's hypothetical, this adverse effect on the owner's adaptation rights makes the defendants' use of the underlying work unfair. It is irrelevant that the re-release of the "Rear Window" film may have promoted sales of the underlying story in the book medium.

This case presents a classic example of an unfair use: a commercial use of a fictional story that adversely affects the story owner's adaptation rights. The district

court erred as a matter of law in concluding that the defendants' use was a fair use.

## IV. *Did the District Court Err in Denying Plaintiff's Motion For Summary Judgment?*

When the district court granted defendants' motions for summary judgment based on *Rohauer* and "fair use," it denied plaintiff's motion for summary judgment as to defendants' liability for copyright infringement. Abend appeals the denial of his motion for summary judgment.[20] He argues that there are no genuine issues of material fact regarding various affirmative defenses raised by the defendants and that he is therefore entitled to judgment as a matter of law.

Although we hold that the district court erred in granting summary judgment for defendants based on *Rohauer* and fair use, we cannot grant plaintiff's motion for summary judgment and decide whether defendants have infringed plaintiff's renewal copyright. Our review of the record indicates that the district court denied Abend's motion because it granted the defendants' motions based on *Rohauer* and fair use, and did not fully consider the merits of Abend's motion regarding the various affirmative defenses raised by the defendants.[21] Consequently, we remand to the district court for reconsideration of plaintiff's motion for summary judgment and the affirmative defenses raised by defendants.

## CONCLUSION

We affirm the district court's denial of defendants' motion for summary judgment based on alleged defects in the story's copyright and renewal.

We reject the Second Circuit's reasoning in *Rohauer* and reverse the district court's grant of summary judgment on this issue.

---

**20.** Ordinarily a denial of a motion for summary judgment is not a final order and thus not appealable. 28 U.S.C. § 1291. However, the district court's grant of summary judgment was a final decision giving us jurisdiction to review its denial of plaintiff's motion for summary judgment.

**21.** These affirmative defenses include estoppel, unclean hands, waiver, abandonment, laches, and copyright misuse.

Likewise, we hold that defendants' re-release of the film was not a "fair use" of the underlying story.

Because the district court may not have considered the merits of Abend's motion for summary judgment, we remand the case to the district court for reconsideration.

DAVID R. THOMPSON, Circuit Judge, dissenting:

I concur in Part I of the majority opinion.

I respectfully dissent from Part II, and write more about that later.

I concur in the majority's conclusion in Part III that the district court erred in granting the defendants' motion for summary judgment based upon the defense of "fair use," but I do not agree with, and accordingly express my dissent from, that portion of Part III in which the majority suggests that the defendants' copyright in the movie, "Rear Window," is in some way limited because the "fair use" defense is inapplicable to Abend's claim of infringement.

The majority's view of "fair use" is premised on a hypothetical example by Professor Nimmer in which he assumes that "an unauthorized motion picture is made based on a copyrighted novel." *See* majority opinion at page 1482. The obvious flaw in this reasoning is that the premise does not apply in this case. Here, the movie "Rear Window" was not an "unauthorized" creation. Moreover, the defendants copyrighted it. It enjoys its own copyright protection as a derivative work, as I discuss later in this dissent. Pursuant to this copyright, the defendants have the right to exploit their movie without infringement by others, including Abend. The unavailability of the "fair use" doctrine as a defense to Abend's claim of infringement of his copyright has nothing to do with the defendants' right to use their movie which is protected by its own copyright.

I dissent from Part IV of the majority opinion, because I believe the district court did not err in denying Abend's motion for summary judgment.

My dissent from Part II is predicated on my conviction that the district court was correct in granting summary judgment in favor of the defendants on the basis of the Second Circuit's decision in *Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484 (2d Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). I would hold, therefore, that the defendants' 1983 re-release and exhibition of their movie, "Rear Window," did not infringe Abend's renewal copyright in the story "It Had To Be Murder."

The majority opinion accurately recites the facts. I state the following only to focus on those circumstances which I believe apply to an appropriate analysis of *Rohauer.*

In 1942, Cornell Woolrich's short story "It Had To Be Murder" was first published. Three years later, Woolrich agreed to assign exclusive worldwide motion picture rights in the story for its initial and renewal copyright terms to the defendants' predecessor-in-interest. Pursuant to this grant, and during the initial term of Woolrich's copyright, the defendants produced and released the motion picture "Rear Window," based in part on Woolrich's story. The film, directed by Alfred Hitchcock and starring James Stewart and Grace Kelly, was released in 1954. It was copyrighted by the defendants at that time.

In 1968, just before the onset of the story's renewal period, Woolrich died. Thus he never assigned the renewal rights in the story to the defendants as he had promised. A year later Woolrich's executor did renew the story's copyright, effective in 1970. In 1971, Abend acquired the story's renewal rights from Woolrich's executor. In 1982, the defendants renewed their copyright in the film "Rear Window." In 1983, the defendants re-released the film. Thereafter, Abend brought this suit claiming infringement of the story's renewal copyright and seeking compensatory damages, an accounting of the defendants' profits and a permanent injunction which, among other things, would enjoin the defendants from exhibiting, distributing, sell-

ing or marketing "Rear Window" in the United States.

The majority believes that *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960) controls this case. *See* majority opinion, page 1474 n. 8 and page 1475. As Judge Friendly explained in *Rohauer*, however,[1] *Miller Music* involved a set of facts significantly different from those presented in *Rohauer* and in the present case. *Rohauer*, 551 F.2d at 490.

*Miller Music* involved *only one* copyrighted work. In that case, two music publishers claimed the right to publish the song "Wine and Roses" through purported assignments of the renewal copyright in the song. Miller Music Company had been assigned the renewal rights by the song's co-author, Ben Black, during the song's initial copyright term. Before that initial term expired, Black died. His will contained no specific bequest concerning the renewal copyright. Black's executor renewed the copyright, which was then distributed by decree of the probate court to Black's residuary legatees. These legatees then assigned the renewal copyright to Charles N. Daniels, Inc. The Supreme Court held that this latter publisher, and not Miller Music Co., owned the publishing rights to the song. In so doing the Court merely addressed "the relative rights of persons claiming full assignment ... of the renewal term of" a single copyrighted work. *Rohauer*, 551 F.2d at 490. *See also Miller Music*, 362 U.S. at 374, 80 S.Ct. at 794.

By contrast here, as in *Rohauer*, two separately copyrighted works, each capable of being renewed under section 24 of the 1909 Act, are involved. The distinction, as Judge Friendly recognized, is an important one. The defendants do not challenge Abend's right to publish the story, nor do they claim a right to publish it themselves; they do challenge Abend's ability to block their right to show their film or to participate in its profits. Instead of being called upon to decide which of two parties *has* rights under the 1909 Act (the question decided by the Court in *Miller Music*), we are called upon to reconcile the interests of two parties who *both* have rights under the 1909 Act. *See Rohauer*, 551 F.2d at 490.

The question thus remains here, as it did in *Rohauer*, whether continued exhibition of the copyrighted derivative work (the film "Rear Window") should be deemed to infringe Abend's renewal copyright on the underlying work (the story "It Had To Be Murder."). *See Rohauer*, 551 F.2d at 485–86. In my view, it should not. Nothing in the 1909 Act limits the use a copyright holder can make of his properly created derivative work. Rather, in section 7 of the 1909 Act, Congress gave derivative works dignity equal to underlying works, by providing that derivative works "shall be regarded as *new works subject to copyright under the provisions of this title,*" so long as "produced with the consent" of the proprietor of the underlying copyright. 17 U.S.C. § 7 (emphasis added). Thus, like an underlying work, a properly created[2] derivative work is entitled to the full range of protection provided to all works copyrighted under the 1909 Act.

Mindful of this, Judge Friendly concluded that it would not make sense to "deprive[] the proprietor of the derivative copyright of a right, stemming from the section 7 'consent' of the original proprietor of the underlying work, to use so much of the underlying copyrighted work as already has been embodied in the copyrighted derivative work" simply because the re-

---

1. The majority asserts that Judge Friendly "virtually ignore[d]" *Miller Music* in *Rohauer*, and *Miller Music* "provides ineluctable authority for Abend's position." Majority opinion at page 1475. The majority thus suggests that Judge Friendly either did not understand or purposely ignored the obvious. As I explain above, I believe Judge Friendly correctly determined that *Miller Music* failed to address the situation presented by *Rohauer*. Indeed, the Justices of the Supreme Court who have expressed an opin-

ion about the *Rohauer* decision have noted that it states the view of the 1909 Act that has "prevailed." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 183 n. 7, 105 S.Ct. 638, 655 n. 7, 83 L.Ed.2d 556 (1985) (White, J., dissenting).

2. There is no dispute that the derivative film "Rear Window" was originally made with valid section 7 consent.

newal copyright in the underlying work had vested in the statutory successor to the original proprietor instead of the original proprietor. *Rohauer*, 551 F.2d at 492. The identical situation is presented here, and the same result should obtain.

Abend argues, and the majority appears to agree, that Judge Friendly's *Rohauer* analysis "violates" the "traditional rule" of this circuit as expressed in *Russell v. Price*, 612 F.2d 1123 (9th Cir.1979), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980), that "a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work." *Russell* at 1128. This is not so.

*Russell* involved the George Bernard Shaw play "Pygmalion." The play was copyrighted by Shaw. A motion picture of the same name based on the play had been produced under a license from Shaw. The film itself was copyrighted when initially made. However, *the film's copyright was never renewed.* The copyright in the underlying play, meanwhile, had been renewed. The case arose when holders of the underlying play's renewal copyright sued defendants who had distributed the film after the film's copyright had expired.

The defendants in *Russell*, citing *Rohauer*, argued that when the film's derivative copyright expired, the whole product entered the public domain free of the monopoly protection of any subsisting copyright in the underlying work. *Russell*, 612 F.2d at 1127. For this reason, defendants argued, the underlying work, like the derivative work, was no longer protected by the copyright laws. We rejected that notion, and explained that the defendants' attempt to rely on *Rohauer* was misplaced, because the facts of *Rohauer* involved "significant differences" from the facts of *Russell*. *Id.* at 1126. The *Russell* court then held that "although the derivative work may enter the public domain, the matter contained therein which derives from a work still covered by statutory copyright *is not dedi-*

cated to the public." *Id.* (emphasis added). The import of the "traditional rule" in *Russell* is simply that a derivative work's loss of its copyright protection does not cause the loss of the underlying work's copyright protection.

In the present case, the defendants do not argue that Woolrich's story is no longer protected from public appropriation. Rather, they assert the right to exhibit their own protected work. Thus, once again the present case is distinguishable because it presents the conflict of two protected works. *Russell*, like *Miller*, involved only one copyrighted work; the film in *Russell* was no longer protected by copyright law. The court in *Russell* was not faced as we are here with two works of equal dignity in the eyes of copyright law. Indeed, the *Russell* court itself pointed out that in *Russell*, unlike *Rohauer*, there was "no longer a conflict between two copyrights, each apparently granting 'their proprietors overlapping "exclusive" rights to whatever underlying material ... had been incorporated into the derivative film.'" *Russell*, 612 F.2d at 1128 (citation omitted).

Both Abend and the majority assert that *Rohauer* runs counter to cases in its own Second Circuit, in particular one case antedating *Rohauer*, *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir.), *cert. denied*, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951), and one case announced after *Rohauer*, *Gilliam v. American Broadcasting Co.*, 538 F.2d 14 (2d Cir.1976). These cases, however, are distinguishable.

Like *Russell*, *Ricordi* did not concern the question whether the holder of a derivative copyright could exhibit that copyrighted work. Rather, it concerned the question whether the derivative copyright holder could produce a new and different derivative work without the consent of the underlying copyright holder.

Ricordi obtained the rights to make a libretto for an opera from the novel "Madame Butterfly." [3] The agreement granted

---

**3.** He also obtained permission to make the opera from the holder of a copyright in a play based on the book; the play had been created pursuant to proper consent of the novel's author as well.

such rights for the *initial* copyright period *only*. Ricordi made the opera and copyrighted it. Later, during the novel's renewal period, Ricordi sued for a declaration that he was entitled to produce a movie based on the opera. The Second Circuit held that to the extent Ricordi had added new matter, he could produce a movie based thereon, but he no longer had the right to exploit the underlying material for a movie. *Ricordi*, 189 F.2d at 471.

Unlike Ricordi, the defendants here do not seek to create a new work from their movie. If they sought to make a play, or even a new movie, *Ricordi* would be applicable. Moreover, there was no challenge in *Ricordi* analogous to the one here—no one there challenged Ricordi's ability to exhibit his opera. For these reasons Judge Friendly in *Rohauer* properly distinguished *Ricordi*. *Rohauer*, 551 F.2d at 493.

Neither is *Gilliam* on point. In that case, a group of British actors and performers known as "Monty Python" held the copyrights in scripts written for a television series. The copyrights in the recorded programs based on the scripts, meanwhile, were held by the British Broadcasting Corporation (BBC). Under a detailed agreement between Monty Python and the BBC, the latter was not permitted to edit the programs without first consulting the Monty Python writers. The BBC later granted the American Broadcasting Company (ABC) the right to broadcast several of the programs. ABC severely edited the programs. Monty Python sued for infringement of their scripts.

In finding for Monty Python, the Second Circuit concluded that since the BBC itself had never obtained permission to edit the scripts, it could not possibly transfer such a right to a third party like ABC. *Gilliam*, 538 F.2d at 21. *Gilliam* has nothing to do with our case.

In sum, when presented with the facts of *Rohauer*, Judge Friendly wrote on a precedent-free slate. He did not, however, look only to the statute. He carefully examined the 1909 Act's legislative history as well as its language in determining that the "force or validity" clause of section 7 "ha[d] no bearing" on the problem there presented. *Rohauer*, 551 F.2d at 488, 490. That is, he concluded that the statutory language had not been designed to address the competing copyrights situation presented by *Rohauer*.[4]

Having found nothing in precedent or legislative history dictating a finding of infringement, Judge Friendly next looked to policy considerations in determining what Congress would have wanted when faced with the problem of competing copyrights. *Rohauer*, 551 F.2d at 493. *See also id.* at 486 ("A court must grope to ascertain what would have been the thought of the 1909 Congress on an issue about which it almost certainly never thought at all."). He decided that it would be "more in keeping with the letter and purposes of the [1909 Act]" not to limit exhibition of the derivative work. *Rohauer*, 551 F.2d at 486. Judge Friendly reasoned that makers of derivative works, unlike licensees who merely print or distribute an unchanged underlying work, make their own creative contributions, of the type Congress sought to protect under copyright law. *Id.* at 493. This factor augurs in favor of allowing the derivative copyright holder to continue exhibiting his work.

Creative contributions by the defendants to the movie "Rear Window" abound. The movie added a love interest not present in the story. And of course the lighting, acting, staging, as well as substantial script adaptations from the basic story, all originated with the film. In short, the film is a new work of art. Faced with substantially

---

4. Abend nevertheless contends that the defendants' re-release of "Rear Window" does impair the "force or validity" of Abend's renewal copyright in the underlying story in violation of section 7. The majority, in finding *Miller Music* dispositive, chose not to decide "whether or how section 7's 'force or validity' clause" is implicated by the present case. *See* majority opinion at page 1474 n. 8. I agree with Judge Friendly's analysis, which applies equally here, that section 7 was not written to address the situation presented by *Rohauer*. *See Rohauer*, 551 F.2d at 488–90.

the same question which was presented in *Rohauer,* there is no reason to depart from its holding. Its reasoning is sound, its precedent is firm, and I see no logic in creating a split of authority in the circuits on this matter of national concern.

The majority states the defendants lost their right to exploit "Rear Window" without Abend's consent, or at least without letting him share in the proceeds from the exploitation, because Woolrich died prior to assigning his renewal rights. I do not agree. In my view, what the defendants lost when Woolrich died before commencement of the renewal term and assignment of his renewal rights was *not* the right to continue to display their separately copyrighted movie. Rather, they lost the right to create a new movie—indeed to create any new work using Woolrich's story. It seems to me this view reads the 1909 Act plainly and gives due weight to *Rohauer, Miller, Russell, Ricordi,* and *Gilliam.*

Contrary to the majority's suggestion, the holding of *Rohauer* does not deny authors of underlying works or their successors a "second chance" to reap benefits from their own works. *See* majority opinion at page 1477. Abend is free to republish "It Had To Be Murder," authorize a new movie, television or theatrical productions, create book cassettes and otherwise capitalize on the success of "Rear Window" in any manner so long as he does not infringe upon the new matter contained in that movie. *See G. Ricordi & Co. v. Paramount Pictures, Inc.,* 189 F.2d 469, 472 (2d Cir.), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951).

Because I believe the defendants should prevail on their *Rohauer* defense, I would not get to the issue of remedies. The majority suggests the parties should share the profits from "Rear Window." It reaches this conclusion apparently because it recognizes the unjust result of its holding that Abend, who invested not one dime in creating the movie, should now have some rights to it. This "share-the-wealth" concept offends my sense of justice. I don't see why Abend should be permitted to squeeze the defendants for money generat-

ed by a movie which they created, in which they risked their capital, and to which they committed their substantial talents. Granted, the defendants used Woolrich's story. But they paid him for it, and he agreed to assign his renewal rights in the story to them. Now, because of the quirk of fate that Woolrich died before the renewal term of the copyright in the underlying story, Abend, according to the majority, is entitled to a portion of "Rear Window's" profits. It just doesn't make sense.