LEWIS GALOOB TOYS, INC., Plaintiff,

v.

NINTENDO OF AMERICA, INC., Defendant.

**and Related and Consolidated Actions.**

**Nos. C–90–1440 FMS, C–90–1586 FMS.**

United States District Court, N.D. California.

July 12, 1991.

MEMORANDUM OF DECISION

FERN M. SMITH, District Judge.

## INTRODUCTION

These two consolidated suits test the scope of copyright protection for audio-visual games (video games). Nintendo of America, Inc. ("Nintendo") markets and sells home video games hardware systems and compatible video game cartridges. The audio-visual portions of the game car-

tridges in suit are protected by registered copyrights held by Nintendo.

Lewis Galoob Toys, Inc. ("Galoob") markets and sells toy products. Galoob has a license to market a video game accessory known as the Game Genie Video Game Enhancer ("Game Genie"), which attaches to a video game cartridge and allows the player to temporarily alter certain attributes of the video game. It is sold for personal consumer use only, not for video game arcades. The Game Genie does not create a separate copy of the original video game, does not make permanent changes to the original game work, and can only be used when attached to the original game.

Nintendo contends that the Game Genie creates a derivative work as defined in 17 U.S.C. § 101, and that Galoob is therefore either a direct or contributory infringer of Nintendo's copyrights in the original video games in suit.

For the reasons set forth below, the Court finds to the contrary and vacates the pending preliminary injunction forthwith.

## SUMMARY OF RULINGS

This case has included one and one-half years of litigation, a two-week trial, and extensive briefing of all issues, both pre- and post-trial. After careful consideration of the evidence and briefing submitted by both sides, and for the reasons set forth below, this Court rules as follows:

1) Use of the Game Genie by consumers to temporarily alter copyrighted video games for their own enjoyment does not create a derivative work under 17 U.S.C. § 101. Because the consumers are not direct infringers, Galoob is not a contributory infringer.

2) In the alternative, even if the Game Genie did create a derivative product, the doctrine of "fair use" enables consumers to use the Game Genie for their personal enjoyment, 17 U.S.C. § 107, and therefore allows Galoob to sell it.

3) Galoob's use of copyrighted video games for purposes of testing or marketing the Game Genie does not violate any of Nintendo's rights under the Copyright Act.

4) On this record, injunctive relief is not appropriate for either side.

## PROCEDURAL BACKGROUND

On May 17, 1990, Galoob filed a complaint for declaratory relief against Nintendo, seeking a declaratory judgment that the Game Genie does not violate or contribute to the violation of any of Nintendo's video game copyrights. Galoob also sought an injunction prohibiting Nintendo from interfering with the marketing of the Game Genie, and permanently enjoining Nintendo from modifying the Nintendo Entertainment System ("NES") in order to make it incompatible with the Game Genie.

Nintendo responded by filing its own complaint for an injunction prohibiting Galoob from all facets of marketing the Game Genie, on the grounds that it contributorily infringed Nintendo's registered copyrights in various video games. Nintendo also claimed violation of the trademark laws.

On July 2, 1990, this Court (per Schnacke, J.) issued a preliminary injunction in favor of Nintendo; the injunction was affirmed by the United States Court of Appeals for the Ninth Circuit on February 27, 1991.

Both actions were transferred on July 6, 1990 to the undersigned, who consolidated them and held a bench trial on the sole issue of whether or not the Game Genie infringes any of Nintendo's copyrights. Nintendo claims that Galoob has wilfully and deliberately infringed, both directly and contributorily, Nintendo's copyrights in its audio-visual game cartridges. Galoob seeks a declaration that use of the Game Genie by individuals in their own homes does not constitute infringement of Nintendo's copyrights, and that Galoob's marketing, distribution, and sale of the Game Genie is therefore not contributory infringement of those copyrights. In addition, Galoob seeks a declaration that its own use of the Game Genie for testing and marketing purposes does not constitute direct infringement.

## PARTIES

Galoob is a corporation organized and existing under the laws of Delaware, with its principal place of business in South San Francisco, California. Nintendo is a Washington state corporation, with its principal place of business at Redmond, Washington, and is a wholly owned subsidiary of Nintendo Company, Ltd., of Japan. Galoob and Nintendo are the only two parties to these consolidated actions. No individual consumers of the Game Genie have been named as defendants, although it is their use of the Game Genie that allegedly constitutes the primary infringing activity.

## JURISDICTION AND VENUE

This civil action arises under the Copyright Act, as amended 17 U.S.C. § 101 et seq.; the Lanham Act, 15 U.S.C. § 1051 et seq.; and California law. This Court has subject matter jurisdiction pursuant to 17 U.S.C. § 501; 15 U.S.C. § 1121; and 28 U.S.C. § 1331, 1332, and 1338.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 1400(a).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. PRODUCTS

This suit involves the interplay of three products, the Nintendo Entertainment System, Nintendo copyrighted video games and the Game Genie.

#### A. The Nintendo Entertainment System

Nintendo markets and sells video game hardware systems. The system is known as the Nintendo Entertainment System ("NES") and is designed for playing video games in the home. Nintendo has sold in excess of 25,000,000 of these systems in the United States. Nintendo also markets and sells video game cartridges, and licenses third parties to market and sell video games which are compatible with Nintendo's hardware. The video games are displayed on a home television.

The NES includes a microprocessor-based console, the "control deck," which houses two processing units: the central processing unit ("CPU"), which controls the overall operation of the system, and the picture processing unit ("PPU"), which generates the pictures for display on the television. The control deck is connected to the television.

#### B. Video Games

The video games which may be played on the NES control deck are both audio-visual works and computer programs. The audio-visual works and game programs are permanently stored on ROMs (i.e., Read Only Memory chips) contained in game cartridges.

Nintendo owns valid and subsisting registered copyrights in the audio-visual programs contained in many of its video games, including those in suit.

Each game typically has a theme and a goal. For example, a game might consist of the main character's attempt to obtain a certain level of points before he is defeated by hostile forces.[1] In an attempt to reach that point goal, he has a certain number of chances ("lives") in which to must overcome obstacles, battle adversaries, and travel through various levels ("worlds"). Each time he overcomes an obstacle or reaches a new world, additional points are added to the score. On the other hand, each time he is defeated by a villain and/or obstacle, he loses a chance or life. If he loses all of his lives before obtaining a certain number of points, the game ends, and he must start again.

More than 500 different video games have been produced and offered for sale for use with the NES Control Deck. In addition to those owned and copyrighted directly by Nintendo, hundreds of games have been produced by some 71 other companies. Sixty-three of the non-Nintendo producers of video games have licenses from Nintendo, and an additional eight do not.

1. For reasons that remain obscure, the protago- nists are generally male.

Players can buy various devices ("interactive devices") which connect to the NES control deck and allow the player to influence various aspects of the game being played. Changes include speeding up certain aspects of the game, skipping one or more levels of play, etc. Interactive devices which may be used with the NES control deck include devices marketed as the "Control Pad," "NES Advantage," "Power Glove," "NES Max," and "Turbo Blaster." Light guns may also be used by players for playing certain games. Nintendo markets and sells, or licenses others to sell, such interactive devices for use with the NES control deck.

The NES video game cartridges contain two separate memories: one memory (the "program memory") is connected to the CPU when the game cartridge is physically inserted into the control deck; the other memory (the "character memory") is connected to the PPU when the game cartridge is physically inserted into the control deck.

In order to play an NES video game, the player inserts a game cartridge into the control deck. The player begins game play and interacts with the video game by manipulating buttons on the standard controller, which is sold with the NES and which attaches to the control deck.

The game's action is performed on the television screen. Players use the controller (which contains a four-way control pad, for directional control, and four other buttons labeled "start," "select," "A" and "B") to guide the actions of "their" character in an attempt to reach the game's goal, as described earlier.

The copyrights allegedly infringed in this suit are for the audio-visual portion of the video game cartridges manufactured by Nintendo. The games are only compatible for play on the NES; they have a retail list price of approximately $40 to $50 each.

### C. The Game Genie

Galoob is in the business of marketing and selling toy products in the United States. Galoob obtained a license to market the Game Genie from Codemasters Software Co., Ltd., a United Kingdom corporation, and Camerica, Ltd., a Canadian corporation. The Game Genie, the accused product, allows players to alter certain attributes of video games, in ways similar to the interactive devices and published codes described *supra* at 1287–88 and *infra* at 1297.

The Game Genie can function in combination with any NES-compatible game cartridge. Six licensed producers of copyrighted Nintendo-compatible games, as well as Nintendo itself, are known to object to the use of the Game Genie with their copyrighted games. It is not known whether the nontestifying Nintendo-licensees or the eight nonlicensed producers of NES-compatible games object or consent to the use of the Game Genie with their copyrighted games, nor is it known how many of the games of Nintendo licensees or nonlicensee producers have registered copyrights.

At this time, the Game Genie is configured both electronically and physically to plug into NES control decks and NES-compatible video game cartridges only; it has no other use.

The Game Genie is designed to fit between the NES control deck and NES-compatible video game cartridges. When a Game Genie is used (*i.e.*, when a game cartridge has been attached to a Game Genie and the Game Genie is then inserted into a control deck), it has two modes of operation: a programming or "set-up" mode, and a game play mode.

If the game cartridge is detached from the Game Genie during operation, all audio-visual displays of the game cease. Likewise, if a game cartridge inserted into a control deck without the Game Genie is removed from the control deck, all game audio-visual displays cease. The Game Genie cannot be used unless it is physically attached to a video game cartridge and then inserted into an NES control deck.

During the Game Genie's set-up mode, a display appears on the television screen and the player is presented with the choice of entering from one to three codes into the Game Genie. Each code can be six to eight

letters in length, and each letter may be chosen from among sixteen available letters of the alphabet. Although there are billions of possible codes, a maximum of three codes can be entered for any single play of a game. When code selection is complete, the player presses the "select" button on the controller, the set-up mode screens display disappears, and the Game Genie shifts into its "game play mode." In this mode, the game begins, and the player plays the game with the alterations allowed by the Game Genie codes the player has entered. If no code has been entered, the Game Genie has no influence on game play, and the game plays exactly as it would if no Game Genie were attached.[2]

If the game player inputs one, two, or three codes into the Game Genie, each entered code causes the CPU to receive different data than it would if the Game Genie were not attached and activated by the game player.

Galoob has prepared a booklet intended to be distributed with the Game Genie entitled "Programming Manual and Code Book" ("Code Book"). The Game Genie Code Book instructions expressly encourage players to alter listed codes and to create various effects by programming their own codes. The effects of all codes, whether devised by Galoob or by the players themselves, are temporary in nature, and will last only until the player unplugs the game or resets in order to start a new game.

There are approximately 1,660 listed codes in the Game Genie code book, allowing various categories of temporary changes to be created with the use of the Game Genie. Some permit the player to choose where to begin the game, i.e. at a higher level of the game rather than at the beginning. Other codes allow the player to increase or decrease the number of chances the player has to complete the game or the amount of time in which those chances can be exercised. Others allow a player to advance more quickly through the game by skipping certain obstacles.[3]

The Game Genie cannot be used to play or do anything unless a separate game cartridge is also used. It can neither substitute for an NES game cartridge, nor can it reproduce or copy an independent version of the game. The effects of the Game Genie last only for the temporal period in which a particular sequence of play continues. Its effects vanish as the player ends a sequence of play by disconnecting the power to the game or by resetting and starting over. The Game Genie codes cannot change the plot, theme, or characters of any game. The vast majority of the Game Genie codes alter the rules of the game or method of play. *See infra* at 1291–92.

The Game Genie is marketed for use by consumers as an accessory to their home video system. It is not intended to be used in connection with any public performance of a video game, e.g. in an arcade setting. *Cf. Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009 (7th Cir.1983), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983). No evidence was presented of any such actual or potential public performance.

## II. SCOPE OF COPYRIGHT PROTECTION

Article I, Section 8, of the Constitution provides: "The Congress shall have Power

**2.** The Game Genie interprets each of the codes a player selects to refer to a particular "address" in the game cartridge program ROM, and the data that are stored there. As the game proceeds, the CPU inquiries that are directed to the game cartridge's program ROM pass through the Game Genie. If an inquiry is directed to an address that matches one of the codes the player has selected, the Game Genie substitutes the data it has stored for the data that the game cartridge would otherwise transmit to the CPU. (For example, assume the CPU asks for the initial number of lives and the game cartridge

has the number "three" at the address corresponding to initial "lives." If the player has selected a code for six lives, the Game Genie would substitute data signifying six lives and send that data to the CPU.)

Each Game Genie code can substitute only a single byte of data at a single address. Thus, of the million or so inquiries per second that the CPU directs to the game cartridge, the Game Genie can interrupt and change relatively few.

**3.** Such effects are paralleled by Nintendo's hardware, passwords, and "secrets," discussed *infra* at 1297.

... To promote the Progress of Science and useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." As new technological developments have occurred, Congress has responded by fashioning new rules of copyright.

Copyright protection is statutory, and the judiciary has shown a general reluctance to expand those protections, absent explicit legislative guidance. *See, e.g., Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 414, 94 S.Ct. 1129, 1141, 39 L.Ed.2d 415 (1974). While there are sound historical and policy reasons for this consistent deference to Congress, Congress cannot immediately respond to each invention that hits the market. The courts must therefore use their best judgment to construe the meaning of certain words consistent with Congressional intent. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 456, 104 S.Ct. 774, 795–96, 78 L.Ed.2d 574 (1984).

■ Copyright protection does not accord a copyright owner complete control over all possible uses of the protected work. As stated in *Sony*, 464 U.S. at 429, 104 S.Ct. at 782:

> The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

Congress appears to have made reward to Nintendo a consideration of the copyright law, but not the only one.

### A. Derivative works

■ The Copyright Act gives the holder exclusive rights to use and authorize the use of the work in five qualified ways, including the preparation of derivative works based upon the copyrighted work.

17 U.S.C. § 106(2). Nintendo alleges that the Game Genie is a derivative work. This Court does not agree.

Section 101 of the 1976 Copyright Act defines a derivative work as "a work based upon one or more preexisting works such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or *any other form* in which a work may be recast, transformed, or adapted" (emphasis added).

Nintendo relies heavily on *Midway Mfg. Co. v. Artic Int'l., Inc.*, 704 F.2d 1009 (7th Cir.1983), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983) in claiming that the Game Genie is a derivative work. That reliance is misplaced. As *Midway* noted, "It is not obvious from [the language of section 101] whether a speeded up video game is a derivative work." *Id.* at 1014. If it was doubtful as to whether or not the product in that case was a derivative work, the uncertainty is far greater regarding the Game Genie. In *Midway*, the allegedly infringing product was a printed circuit board which could be used to speed up the rate of play—how fast the sounds and images changed—of one of plaintiff's video games ("Galaxian"), licensed for use in a play-for-pay arcade setting. Under those circumstances, the Seventh Circuit found that speeding up that specific game increased the licensee's revenue by making the game more challenging and decreasing the time it took to complete a game, i.e., more games could be played in a given time period, generating more income for the licensee. Acknowledging that the copyright owners of that video game would be anxious to obtain that extra revenue, the court found that commercial licensees were not implicitly authorized to use the speeded up circuit boards; therefore, the suppliers of those circuit boards contributorily infringed because the speeded version of the game was a derivative work. 704 F.2d at 1014.

Based on those facts, *Midway* held that the "amount by which the language of section 101 *must be stretched* to accommodate speeded up video games is ... within

the limits with which Congress wanted the new act to operate." *Id.*, (emphasis added). The result appeared to be based on the equities of that situation. Under those facts, the court was willing to "stretch" the acceptable definition of a derivative work. *Midway*'s result, if not its analysis, appears to have turned on the fact that the licensee arcade owner, not the copyright holder, was making money from the public performance of the altered game, a violation of section 106(4) (copyright holder has exclusive right "to perform the copyrighted work publicly").[4]

The alleged infringer in this case is not a commercial licensee, but rather a consumer utilizing the Game Genie for noncommercial, private enjoyment. Such use neither generates a fixed transferable copy of the work, nor exhibits or performs the work for commercial gain. *See* §§ 102, 106(4).

■ Whether or not video games modified by the Game Genie constitute derivative works is a difficult question. Viewing the Copyright Act as a whole, however, and considering the policies behind that Act, this Court concludes that inherent in the concept of a "derivative work" is the ability for that work to exist on its own, fixed and transferable from the original work, i.e., having a separate *"form"*. *See* § 101 (derivative work definition). The Game Genie does not meet that definition.

As explained *supra*, a Game Genie allows a player to choose one to three modifications in the rules of a game, during a limited sequence of play. Once the Game Genie and its attached game cartridge are disconnected from the NES, or the power is turned off, those changes disappear and the video game reverts to its original form. No independent, fixed work is created.

In construing the phrase "derivative work" in light of technological change which has rendered its literal meaning ambiguous, the Court looks to the "basic purpose" of the Copyright Act—balancing a fair return on an author's creative labor against the need for "broad public availability of literature, music, and the other

arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975). The Game Genie is a tool by which the consumer may temporarily modify the way in which to play a video game, legally obtained at market price. Any modification is for the consumer's own enjoyment in the privacy of the home. Such a process is analogous in purpose, if not in technology, to skipping portions of a book, learning to speed read, fast-forwarding a video tape one has purchased in order to skip portions one chooses not to see, or using slow motion for the opposite reasons. None of those practices permanently modifies or alters the original work, none produces a separate work which can then be transferred in any way, none replaces the original work, and none deprives the copyright holder of current or expected revenue.

Both parties agree that it is acceptable, under the copyright laws, for a noncopyright holder to publish a book of instructions on how to modify the rules and/or method of play of a copyrighted game. Once having purchased, for example, a copyrighted board game, a consumer is free to take the board home and modify the game in any way the consumer chooses, whether or not the method used comports with the copyright holder's intent. The copyright holder, having received expected value, has no further control over the consumer's private enjoyment of that game.

Because of the technology involved, owners of video games are less able to experiment with or change the method of play, absent an electronic accessory such as the Game Genie. This should not mean that holders of copyrighted video games are entitled to broader protections or monopoly rights than holders of other types of copyrighted games, simply because a more sophisticated technology is involved. Having paid Nintendo a fair return, the consumer may experiment with the product and create new variations of play, for personal enjoyment, without creating a derivative work. *Cf. Midway*, 704 F.2d at 1013–14

---

4. This Court expresses no view as to whether commercial arcade use of the Game Genie would be an unauthorized showing under section 106.

(arcade use is a derivative work, because "[v]ideo game copyright owners would like to lay their hands on some of that extra revenue").

For these reasons, this Court finds that the Game Genie does not create a derivative work protected by the copyright laws.

### B. Fair use.

Had the Court found that the Game Genie was a derivative work, Galoob would still be exempt from liability under the doctrine of "fair use." In making this finding, the Court has relied extensively on *Sony v. Universal, supra,* as well as the trial court's opinion in that matter.

As the Supreme Court stated in *Sony,* "[a]ny individual may reproduce a copyrighted work for a 'fair use'; the copyright owner does not possess the exclusive right to such a use." 464 U.S. at 433, 104 S.Ct. at 784. "The doctrine of fair use allows a holder of the privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner." *Narell v. Freeman,* 872 F.2d 907, 913 (9th Cir.1989). Determination of fair use requires analysis under an "equitable rule of reason." *Sony,* at 464 U.S. at 448, 104 S.Ct. at 792 (quoting H.R.Rep. No. 94–1476, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 5659, 5679). "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration." *Sony,* 464 U.S. at 429, 104 S.Ct. at 782 (quoting *Fox Film Corp. v. Doyal,* 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932)).

*Sony*—the only pronouncement by the Supreme Court on fair use in the contributory infringement context—involved facts analogous to those here. In *Sony,* holders of copyrights for certain television programs sued the manufacturer of the Betamax video tape recorder (video cassette recorder, or VCR) for contributory infringement. Those copyright holders (like Nintendo) sought to enjoin Sony (like Ga-

loob) from manufacturing and selling an electronic device, claiming that purchasers of that device were using it to infringe copyrights. One use of the device was recording unauthorized copies of copyrighted television programs to "time shift" on-the-air broadcasts. The Supreme Court found the consumers' use of Sony's product for time shifting purposes to be a "fair use" of the copyrighted programs.

Fair use is a privilege against a direct infringement claim (17 U.S.C. § 107), and is a privilege held in the first instance by the alleged direct infringer—*i.e.,* by the person playing the video game. Just as application of the fair use doctrine in *Sony* resulted in substantial economic gain for Sony and other VCR manufacturers, the fair use doctrine applied to this case will benefit Galoob. *Sony* makes clear, however, that it is the fairness of the *family's* use of its video game, not some evaluation of the commercial "fairness" of Galoob's product, that must guide the Court's analysis.

In examining the fairness of the family's use, the Court is guided statutorily by 17 U.S.C. § 107, through which Congress, in 1976, codified the common law doctrine of fair use.[5] Section 107 enumerates four non-exclusive "factors to be considered" in assessing fair use; they are intended to guide but not to limit analysis. H.R.Rep. No. 94–1476 at 5680; *see also Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (four factors "not meant to be exclusive"). In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

---

**5.** That statute was merely "intended to restate the present judicial doctrine of fair use, not to change, narrow or enlarge it in any way." H.R.Rep. No. 94–1476, *supra,* at 5680. Congress had "no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change." *Id.*

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

1. The First Factor: A Family's "Non-Commercial" Home Use Of Its Video Games Creates A Presumption Of Fair Use.

 The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit purposes." 17 U.S.C. § 107(1). If the consumer were making a commercial or profit-making use of the copyrighted work, that use would be presumptively unfair. *Sony,* 464 U.S. at 449, 104 S.Ct. at 792. "The contrary presumption is appropriate here, however, ... because time-shifting for private home use must be characterized as a non-commercial, nonprofit activity." *Sony,* 464 U.S. at 449, 104 S.Ct. at 792. Likewise, a family's use of a Game Genie for private home enjoyment must be characterized as a non-commercial, non-profit activity. The game owner is simply playing the game purchased for personal enjoyment, not exploiting the game in some commercial venture. The first factor therefore establishes a presumption of fair use, which could be overcome only by Nintendo's direct proof of injury.[6]

The *Midway* decision does not analyze the commercial use of such products *vis-a-vis* private home use. By contrast, this Court finds a convincing and persuasive analogy in the trial court's analysis of legislative intent in *Universal City Studios v. Sony Corp. of America,* 480 F.Supp. 429 (C.D.Cal.1979). That court, in discussing whether or not home recording of copyrighted works violated the Copyright Act, quoted the following from the House Report accompanying the 1971 Amendment:

"Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing or otherwise capitalizing commercially on it." H.Rep. No. 487, 92nd Cong., First Sess. 7, *reprinted in* 1971 U.S.Code Cong. & Admin. News at 1566–1572.

Further citations to the Congressional Record acknowledged a reluctance to interpret or enforce the Copyright Act by carrying copyright protection into the home or by banning devices for off-the-air recording. *Id.,* at 445. While the Game Genie is a different device than a video home recorder, it involves the same policy decision, i.e., whether Congress wishes to carry copyright enforcement into the home.

2. The Second Factor: The Published "Nature" Of Video Games Supports Fair Use.

 The second factor considers "the nature of the copyrighted work." 17 U.S.C. § 107(2). The courts have traditionally inquired whether the work is published, with unpublished works gaining more protection. 3 Nimmer § 13.05[A][2], at 13–75 to 13–79. "The fact that a work is unpublished is a critical element of its 'nature' " suggesting that pre-publication exploitation of the work would be unfair. *Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2232–33 (unfair to scoop key excerpts of unpublished manuscript without author's consent). By contrast, Nintendo has already published millions of copies of its games to anyone willing to pay the purchase price. Only after acquiring a published copy of the game may its owner use it in combination with the Game Genie. The works' published nature supports the fairness of the use.

---

**6.** Although Nintendo emphasized the "productive use" doctrine, *Sony* minimized the importance of that doctrine by reversing the Ninth Circuit's conclusion that time-shifting "was not a fair use because it was not a 'productive use.' " *Sony* 464 U.S. at 427, 104 S.Ct. at 781; *see also*

Fisher, *Reconstructing The Fair Use Doctrine,* 101 Harv.L.Rev. 1661, 1684 (1988) ("The most dramatic change wrought by *Sony* and *Harper & Row* in the fair use doctrine was the subordination of the idea of productivity").

3. The Third Factor: Because Game Owners Have The Right To Use The Games They Purchase, Their Use Does Not Weigh Against Fair Use.

The third factor in the fair use analysis is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Again, the *Sony* decision is dispositive. *Sony* recognized that the reproduction of an entire work ordinarily weighs against the claim of fair use. 464 U.S. at 450, 104 S.Ct. at 792–93. In *Sony*, however, because the VCR owner "had been invited to witness [the television program] in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use." *Id.* at 449, 104 S.Ct. at 792. Likewise, in this action a game owner who has fairly acquired a Nintendo game has a right to use the entire work. The game owner's rights are equal to, if not greater than, those of the user in *Sony*, who did not pay for the product being used. Because the game owner is entitled to use the entire work, no matter what the "amount and substantiality" of his use, the third factor cannot assist Nintendo in overcoming the presumption of fair use.

4. The Fourth Factor: Nintendo Has Not Proven Harm

The last and "undoubtedly the single most important" factor is the "effect of the use upon the potential market for or value of the copyrighted work." *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233–34; 17 U.S.C. § 107(4). To defeat fair use under this factor "requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Sony*, 464 U.S. at 451, 104 S.Ct. at 793.

Nintendo bears the burden of proving that these particular uses will have an adverse effect on the market for the copyrighted Nintendo games. *Sony*, 464 U.S. at 451, 104 S.Ct. at 793. It has not met that burden, for the reasons explained below.

a. *Nintendo Has Not Shown That The Game Genie Supplants, Rather Than Suppresses, The Market For The Copyrighted Works.*

The fourth fair use factor looks primarily to whether a use "supplants any part of the normal market for a copyrighted work." H.R.Rep. No. 83, 90th Congress, 1st Sess. 33, 35 (1967), as quoted in *Marcus v. Rowley*, 695 F.2d 1171, 1177 (9th Cir. 1983). Nintendo cannot demonstrate that use of the Game Genie *"fulfills the demand* for the original" of the copyrighted games at issue. *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir.1986) (emphasis in original). Widespread use of the Game Genie cannot supplant the market for the games in suit. The Game Genie cannot operate without a game cartridge. Significantly, Nintendo does not contend that families will buy fewer new games because they are using their Game Genie with old ones. The Game Genie does not compete for sales with the original copyrighted works for which Nintendo claims infringement.

Nintendo's claim is that the Game Genie will *indirectly* harm its overall market because it will make people enjoy their games less, and thereby generally reduce demand for Nintendo's copyrighted games. Nintendo had the burden of proof on that issue and failed to meet it.

A fair use will frequently suppress demand for a work, but as long as it does so without supplanting demand, the indirect detrimental effect on the market is not the subject of copyright protection. An obvious example is an unfavorable book or movie review containing quotations from the copyrighted work, along with criticism which may suppress demand. This capacity to injure does not impede a finding of fair use. *See Fisher v. Dees*, 794 F.2d at 438. Another example is a parody, which "may quite legitimately aim at garroting the original, destroying it commercially as well as artistically." *Id.* at 437. As the Ninth Circuit holds, however, "the economic effect of [the use] with which we are concerned is not its potential to destroy or diminish the market for the original—any

bad review can have that effect—but rather whether it *fulfills the demand* for the original. Biting criticism suppresses demand; copyright infringement usurps it." *Id.* at 438 (emphasis in original).

The Second Circuit applied this principle in *Consumers Union of U.S. Inc. v. General Signal Corp.*, 724 F.2d 1044 (2d Cir. 1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). There, defendant's advertisements quoted the favorable rating of its product by Consumer Reports, a copyrighted magazine. In an argument reminiscent of Nintendo's claim that it will lose "goodwill" as a result of the Game Genie, Consumer Reports alleged that the value of its magazine was diminished because its reputation for independence would suffer as a result of being perceived as endorsing defendant's product. The Second Circuit rejected plaintiff's argument in no uncertain terms:

> The Copyright Act was not designed to prevent such indirect negative effects of copying. The fourth factor is aimed at the copier who attempts to usurp the demand for the original work. The copyright laws are intended to prevent copiers from taking the owner's intellectual property, and are not aimed at recompensing damages which may flow indirectly from copying.

724 F.2d at 1051 (citations omitted).

Nintendo argues that its market may be affected by suppression of demand rather than supplanting of it. That injury, even if it were likely, does not defeat fair use.

b. *Nintendo Has Not Shown Any Injury To The Relevant Market For The Copyrighted Works.*

Nintendo has likewise failed to prove an adverse effect on the relevant market for the copyrighted works at issue. Most of Nintendo's original copyrighted works are no longer on the market, including the vast majority for which the Galoob Code Book lists codes. The Game Genie cannot affect sales of products no longer available.[7]

Nintendo also seeks relief for harm that may occur in the future, on the grounds that the Game Genie may decrease demand for sequels or slightly altered versions of Nintendo games. Nintendo has not, to date, issued or considered issuing altered versions of existing games. Nintendo argues, however, that should such a market develop within the copyright period, it is entitled to decide if such games are appropriate and to reap the resulting revenues. In theory, Nintendo is correct; however, it has failed to show the reasonable likelihood of such a market. Nintendo's video games are expensive toys; each retails in the $40 to $50 range. There is neither evidence nor reason to believe that a consumer who owns the original game would invest a similar amount in a slight variation thereof.

In addition, Nintendo's assertion that it may wish to re-release altered versions of the games in suit 10, 20 or 30 years from now (much as Parker Brothers recently did with "Monopoly") is at odds with the position taken by Nintendo in various other lawsuits pending before this Court. In those actions, Nintendo opposes antitrust claims by using the vagaries of the video game industry to rebut the impact and permanence of its market control, if any. Having indoctrinated this Court as to the fast pace and instability of the video game industry, Nintendo may not now, without any data, redefine that market in its request for the extraordinary remedy sought herein. Nintendo has failed to show any harm to the present market for its copyrighted games and has failed to establish the reasonable likelihood of a potential market for slightly altered versions of the games at suit. While good board games may never die, good video games are mortal.

c. *Nintendo Has Not Shown That Any Uses of the Game Genie Would Have A Deleterious Effect On Sales.*

The only empirical evidence of market reaction to the Game Genie is the Canadian study, which indicates that the Game Genie

---

**7.** Furthermore, even if the Game Genie published code books for up-to-the-minute games, Nintendo has not shown that consumers would be *less* likely to buy the games simply because code books for current games were available.

will enhance, not detract from, Nintendo's sales. *See Sony,* 464 U.S. at 423–24, 452–53, n. 36–37, 104 S.Ct. at 779–80, 793–94, n. 36–37 (relying on consumer survey to determine market impact). During February of this year, 6 months after introduction of the Genie in Canada, a market research firm polled 300 Canadian owners of the Game Genie, aged 8 or older. The survey failed to reveal any detrimental effect to the Nintendo market.[8]

Nintendo objected to the survey on various grounds, including the fact that Canadians, not Americans, were polled. Nintendo's criticisms go to the weight of the survey, not its admissibility. Nintendo offered no meaningful evidence that consumer research in the United States is performed differently from that conducted in Canada, or that consumers who play video games in the United States have different tastes or attitudes than do video game players in Canada. Nintendo has access to its own sales data for the nine months Game Genie has been on sale in Canada. Nevertheless, it produced neither statistical evidence of lost sales nor any Canadian retailer testimony of adverse impact from Game Genie on the demand for Nintendo games. The Court is influenced by Nintendo's failure to proffer any empirical evidence of a negative market impact or potential impact from the Game Genie. The only reasonable inference for the trier of fact is that no such impact exists.

Nintendo failed to take advantage of other opportunities to show lost sales. For instance, Nintendo uses ongoing focus groups as part of its continuing marketing and quality control. It could have used those groups to test the effect of Game Genie use on attitudes about Nintendo games. It did not. Since Nintendo had the incentive, opportunity and ability to proffer such evidence, its failure to do so gives rise to the contrary inference, i.e., that there

are no material differences between the Canadian and American markets, and that the Game Genie has had no detrimental impact on Nintendo's sales in Canada.

Galoob's evidence on sales was persuasive. In additional to the survey data, Galoob proffered expert testimony from Glenn Rubenstein, a member of Nintendo's "target" market (males between 8 and 14 years old). He has been a serious player of video games for several years and spends as many as 30 hours per week with this avocation. He has written numerous magazine and newspaper articles critiquing various video games, including Nintendo's. Rubenstein's opinion is that the Game Genie would encourage rather than discourage enthusiasm over video games in general, because it allows players to explore new ways of playing a game, thereby making the game more accessible to players of differing abilities. This would likely increase the use of a video game in a multi-player family, providing more value per consumer dollar. The Court found his testimony more convincing than that of Nintendo's employees and experts.

For these reasons, the Court is unconvinced that the Game Genie will decrease Nintendo's sales.

### d. *Harm to the Nintendo Culture is Not Cognizable Under Copyright Law.*

■ Nintendo's main objection to and claimed damage from the Game Genie is the potential detriment to the "Nintendo Culture," a concept discussed at length by Nintendo's attorneys and witnesses. This culture, the apex of Nintendo's marketing strategy, is a mind-set intentionally created by Nintendo in its consumers. Like most cults, fads or addictions, it thrives when fueled by constant peer pressure. Nintendo fears that, by allowing users to change the rules of Nintendo games, the Game Genie will upset the inculturation process

---

**8.** 72% of the respondents believe that the Game Genie makes video games more fun. 45% enjoy playing their games more than before they had a Game Genie, 53% enjoy their games the same, only 2% enjoy their games less.

52% are more interested in buying new video games since they have had the Game Genie, and only 2% are less interested.

29% of the respondents play their Nintendo games more often than before they had a Game Genie, 67% play their games the same amount, and only 4% play their games less often.

that Nintendo has designed into its products, thereby lessening the value of membership in "the culture" and reducing product loyalty. Having rescued the video game industry from the shambles of the early 1980s, Nintendo argues that it is now entitled to decide how its games should be enjoyed, by whom, and under what circumstances, even after the consumer has paid full price.

According to Nintendo, the Game Genie will harm the Nintendo culture in two distinct ways. First, it argues that the use of the Game Genie allows players to modify Nintendo's carefully crafted games in such a way that ultimate user satisfaction will be diminished, leading to an over-all decline in the video game industry. Nintendo called several witnesses, including its own game designers and two behavior modification psychologists, each of whom opined that 1) Nintendo's games are designed to provide ultimate satisfaction; 2) tampering with Nintendo's design in any way thwarts the "challenge of the game", or its "playability", thereby resulting in lesser enthusiasm for video games in general, and Nintendo games in particular; and 3) this reduced enjoyment may lead to the drastic decline in the video game market similar to that which occurred in the early 1980s, even if it does not diminish revenue for the particular games in suit.[9] Neither the Nintendo employees nor the behavioralists provided empirical data upon which to support the claim that Nintendo is better able to judge when a player is having fun than is the player herself.

There is no doubt that Nintendo revitalized the video game industry, nor is there any doubt that it produces a carefully controlled and well-made product which is impressively marketed. Nevertheless, those achievements do not give Nintendo a right to expand its copyright protection beyond that granted under the copyright laws.

Moreover, Nintendo's argument that any device that makes game play easier will injure its market for video games is undermined by its own behavior. It is significant that Nintendo markets publications and devices that make similar modifications available. For example, Nintendo publishes "passwords" enabling game owners to start game play at different levels or worlds and with different powers. Nintendo Power magazine[10] contains "secret" codes which allow game owners to skip to portions of games they enjoy, or to gain additional lives. Nintendo also markets an interactive device called the "NES Advantage," which can substitute for the controller included with the standard Nintendo system. Among the advantages that NES Advantage provides are the options of slow motion play and extra fire power to make game play easier. These are similar to options that Game Genie makes available to players. The fact that Nintendo offers consumers the ability to temporarily alter the images of their games undercuts Nintendo's arguments that such alterations are likely to create disincentive for the purchase of additional video games. If Nintendo believed this, it would not market accessories which it feared would lead to the demise of its multibillion dollar share of the video game industry.[11]

**9.** For instance, Nintendo's expert Professor Gregory Loftus declared:

The majority of Nintendo's players belong to a loose social confederation that might collectively be called the 'Nintendo culture.' This culture includes talking about Nintendo video games with friends, comparing scores and achievements, ... and getting high scores published. The operation of the Nintendo culture rests entirely on the games being challenging.... Being part of the Nintendo culture would no longer be enjoyable or meaningful, and sales of Nintendo video games would decline.... Were Game Genie use to become prevalent, the photographing of a particular screen [to show a high score] would

not be indicative of any skill or achievement, and this socially-reinforcing practice would fall by the wayside.

G. Loftus narr. stmnt at 3; *see also* P. Main narr. stmnt at 3; H. Lincoln narr. stmnt at 17; H. Phillips narr. stmnt at 6.

**10.** The magazine is copyrighted by Nintendo of America.

**11.** Indeed, Nintendo's chief marketing officer, Peter Main, contradicts the theory that Nintendo asserts in this case. In the analysis he presented at a 1989 Nintendo sales meeting, Mr. Main stated:

Let's not forget that key category called accessories. Good accessories are important for

█ Nintendo has attempted to achieve in this litigation what it could not achieve in the market—the "exclusive right to modify game play as it alone sees fit and to maintain game play in its original state." Nintendo's Reply Memo. In Supp. Prelim. Injunc. at 17–18. This Court does not interpret the Copyright Act as bestowing such broad monopoly powers. The Copyright Act protects authorship, not market psychology.

### 5. Fair use summarized.

To summarize the four fair use factors, then, the non-commercial nature of the player's home use of the Game Genie creates a presumption of fair use under *Sony*. The published nature of video games supports the fairness of a consumer's transitory alterations of those images. Because the game owner has the indisputable right to use his or her entire game, the amount of his or her use cannot weigh against fairness. Further, Nintendo has failed, in three respects, to carry its burden to prove injury: It has not shown that any use supplants demand for its works, that any actual or reasonably likely market is injured, or that use of the Game Genie in ways that arguably infringe Nintendo's copyrights would diminish the overall demand for Nintendo games. Lacking proof that either actual or likely markets for the copyrighted works are liable to be affected, Nintendo has failed to satisfy the fourth fair use factor.

In short, even were the Court to find that the use of the Game Genie allows players to produce a derivative work, the shield of fair use is available and would provide a complete defense to any claim of direct infringement against the game players. Absent direct infringement, there is no contributory infringement.

## III. DIRECT INFRINGEMENT

█ Because the Game Genie does not create a derivative work when used in conjunction with a copyrighted video game, Galoob does not "authorize the use of a copyrighted work without actual authority from the copyright owner." *Sony*, 464 U.S. at 435 n. 17, 104 S.Ct. at 785 n. 17. All of the cases Nintendo cites on this point deal with unauthorized public performances for profit, § 106(4), not private, non-commercial use. Further, Galoob is not liable as a direct infringer for testing, demonstrating, and marketing the Game Genie, or for developing codes for use with the Game Genie.

## IV. INJUNCTIVE RELIEF

█ Even had this Court found that the Game Genie infringes Nintendo's copyrights, a permanent injunction in favor of Nintendo would not be the appropriate remedy because:

1) Any presumption of immediate and irreparable harm resulting from the alleged infringement was rebutted;

2) The presence of the Game Genie in the market benefits the public by expanding personal consumer utilization of purchased games; and

3) Assuming infringement, adequate remedies exist at law.

## CONCLUSION

For the reasons stated above, the Court orders declaratory relief as follows: (1) the use of a Game Genie by consumers, for non-commercial use, does not violate Nintendo's rights under the Copyright Act of 1976; and (2) Galoob is neither a contributory nor a direct infringer.

The pending preliminary injunction enjoining Galoob from exercising all commercial activities associated with its license for the Game Genie should be and is hereby DISSOLVED.

---

several reasons including ... because *they give added value to our software by giving an NES player a whole new experience and sense of game play* when he replays a piece of software with one of the accessor[ies]. *And all that adds up to increased consumer satis-*

*faction which brings them back for more.* Two of the strongest performers in this regard are the Max and Advantage controllers.... Text of speech delivered at the 1989 SCES sales meeting, June 2, 1989, Ex. G–364 (emphasis added).

This Court will not stay the lifting of the injunction, pending appeal, because further equitable relief for Nintendo is unwarranted. Any request for a stay should be addressed to the Ninth Circuit Court of Appeals.

The parties are ordered to appear before this Court on Monday, August 19, 1991 at 2:30 p.m., to discuss further proceedings in this matter.

SO ORDERED.