LEWIS GALOOB TOYS, INC.,
Plaintiff–Appellee,

v.

NINTENDO OF AMERICA, INC.,
Defendant–Appellant.

NINTENDO OF AMERICA, INC.,
Plaintiff–Appellant,

v.

LEWIS GALOOB TOYS, INC.,
Defendant–Appellee.

No. 91–16205.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 1992.

Decided May 21, 1992.

As Amended Aug. 5, 1992.

Thomas G. Gallatin, Jr., Mudge Rose Guthrie Alexander & Ferdon, New York City, for defendant-appellant.

Jerome B. Falk, Jr., Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., for plaintiff-appellee.

Before FARRIS and RYMER, Circuit Judges, and KENYON,* District Judge.

* Honorable David V. Kenyon, United States District Judge for the Central District of California, sitting by designation.

FARRIS, Circuit Judge:

Nintendo of America appeals the district court's judgment following a bench trial (1) declaring that Lewis Galoob Toys' Game Genie does not violate any Nintendo copyrights and dissolving a temporary injunction and (2) denying Nintendo's request for a permanent injunction enjoining Galoob from marketing the Game Genie. *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F.Supp. 1283 (N.D.Cal.1991). We have appellate jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1291 and 1292(a)(1). We affirm.

## FACTS

The Nintendo Entertainment System is a home video game system marketed by Nintendo. To use the system, the player inserts a cartridge containing a video game that Nintendo produces or licenses others to produce. By pressing buttons and manipulating a control pad, the player controls one of the game's characters and progresses through the game. The games are protected as audiovisual works under 17 U.S.C. § 102(a)(6).

The Game Genie is a device manufactured by Galoob that allows the player to alter up to three features of a Nintendo game. For example, the Game Genie can increase the number of lives of the player's character, increase the speed at which the character moves, and allow the character to float above obstacles. The player controls the changes made by the Game Genie by entering codes provided by the Game Genie Programming Manual and Code Book. The player also can experiment with variations of these codes.

The Game Genie functions by blocking the value for a single data byte sent by the game cartridge to the central processing unit in the Nintendo Entertainment System and replacing it with a new value. If that value controls the character's strength, for example, then the character can be made invincible by increasing the value sufficiently. The Game Genie is inserted between a game cartridge and the Nintendo Entertainment System. The Game Genie does not alter the data that is stored in the game cartridge. Its effects are temporary.

## DISCUSSION

### 1. *Derivative work*

The Copyright Act of 1976 confers upon copyright holders the exclusive right to prepare and authorize others to prepare derivative works based on their copyrighted works. *See* 17 U.S.C. § 106(2). Nintendo argues that the district court erred in concluding that the audiovisual displays created by the Game Genie are not derivative works. The court's conclusions of law are reviewed *de novo*. *See Rozay's Transfer v. Local Freight Drivers, Local 208*, 850 F.2d 1321, 1326 (9th Cir.1988), *cert. denied*, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). Its findings of fact are reviewed for clear error. *See id.*

■ A derivative work must incorporate a protected work in some concrete or permanent "form." The Copyright Act defines a derivative work as follows:

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, *or any other form in which a work may be recast, transformed, or adapted.* A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101 (emphasis added). The examples of derivative works provided by the Act all physically incorporate the underlying work or works. The Act's legislative history similarly indicates that "the infringing work must incorporate a portion of the copyrighted work in some form." 1976 U.S.Code Cong. & Admin.News 5659, 5675. *See also Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343–44 (9th Cir.1988) (discussing same), *cert. denied*, 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989).

■ Our analysis is not controlled by the Copyright Act's definition of "fixed." The

Act defines copies as "material objects, other than phonorecords, in which a work is *fixed* by any method." 17 U.S.C. § 101 (emphasis added). The Act's definition of "derivative work," in contrast, lacks any such reference to fixation. *See id.* Further, we have held in a copyright infringement action that "[i]t makes no difference that the derivation may not satisfy certain requirements for statutory copyright registration itself." *Lone Ranger Television v. Program Radio Corp.*, 740 F.2d 718, 722 (9th Cir.1984). *See also* Paul Goldstein, *Derivative Rights and Derivative Works in Copyright,* 30 J. Copyright Soc'y U.S.A. 209, 231 n. 75 (1983) ("the Act does not require that the derivative work be protectable for its preparation to infringe"). *Cf. Kalem Co. v. Harper Bros.*, 222 U.S. 55, 61, 32 S.Ct. 20, 21, 56 L.Ed. 92 (1911) (finding the movie "Ben Hur" infringed copyright in the book *Ben Hur* even though Copyright Act did not yet include movies as protectable works). A derivative work must be fixed to be *protected* under the Act, *see* 17 U.S.C. § 102(a), but not to *infringe.*

The argument that a derivative work must be fixed because "[a] 'derivative work' is a work," 17 U.S.C. § 101, and "[a] work is 'created' when it is fixed in a copy or phonorecord for the first time," *id.*, relies on a misapplication of the Copyright Act's definition of "created":

> A work is 'created' when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

*Id.* The definition clarifies the *time* at which a work is *created.* If the provision were a definition of "work," it would not use that term in such a casual manner. The Act does not contain a definition of "work." Rather, it contains specific definitions: "audiovisual works," "literary works," and "pictorial, graphic and sculptural works," for example. The definition

of "derivative work" does not require fixation.

■ The district court's finding that no independent work is created, *see Galoob*, 780 F.Supp. at 1291, is supported by the record. The Game Genie merely enhances the audiovisual displays (or underlying data bytes) that originate in Nintendo game cartridges. The altered displays do not incorporate a portion of a copyrighted work in some concrete or permanent *form.* Nintendo argues that the Game Genie's displays are as fixed in the hardware and software used to create them as Nintendo's original displays. Nintendo's argument ignores the fact that the Game Genie cannot produce an audiovisual display; the underlying display must be produced by a Nintendo Entertainment System and game cartridge. Even if we were to rely on the Copyright Act's definition of "fixed," we would similarly conclude that the resulting display is not "embodied," *see* 17 U.S.C. § 101, in the Game Genie. It cannot be a derivative work.

*Mirage Editions* is illustrative. Albuquerque A.R.T. transferred artworks from a commemorative book to individual ceramic tiles. *See Mirage Editions*, 856 F.2d at 1342. We held that "[b]y borrowing and mounting the preexisting, copyrighted individual art images without the consent of the copyright proprietors ... [Albuquerque A.R.T.] has prepared a derivative work and infringed the subject copyrights." *Id.* at 1343. The ceramic tiles *physically* incorporated the copyrighted works in a form that could be sold. Perhaps more importantly, sales of the tiles supplanted purchasers' demand for the underlying works. Our holding in *Mirage Editions* would have been much different if Albuquerque A.R.T. had distributed lenses that merely enabled users to view several artworks simultaneously.

Nintendo asserted at oral argument that the existence of a $150 million market for the Game Genie indicates that its audiovisual display must be fixed. We understand Nintendo's argument; consumers clearly would not purchase the Game Genie if its display was not "sufficiently permanent or

stable to permit it to be perceived ... for a period of more than transitory duration." 17 U.S.C. § 101. But, Nintendo's reliance on the Act's definition of "fixed" is misplaced. Nintendo's argument also proves too much; the existence of a market does not, and cannot, determine conclusively whether a work is an infringing derivative work. For example, although there is a market for kaleidoscopes, it does not necessarily follow that kaleidoscopes create unlawful derivative works when pointed at protected artwork. The same can be said of countless other products that enhance, but do not replace, copyrighted works.

Nintendo also argues that our analysis should focus exclusively on the audiovisual displays created by the Game Genie, *i.e.*, that we should compare the altered displays to Nintendo's original displays. Nintendo emphasizes that " '[a]udiovisual works' are works that consist of a series of related images ... *regardless of the nature of the material objects ... in which the works are embodied.*" 17 U.S.C. § 101 (emphasis added). The Copyright Act's definition of "audiovisual works" is inapposite; the *only* question before us is whether the audiovisual displays created by the Game Genie are "derivative works." The Act does not similarly provide that a work can be a derivative work regardless of the nature of the material objects in which the work is embodied. A derivative work must incorporate a protected work in some concrete or permanent form. We cannot ignore the actual source of the Game Genie's display.

Nintendo relies heavily on *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009 (7th Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983). *Midway* can be distinguished. The defendant in *Midway*, Artic International, marketed a computer chip that could be inserted in Galaxian video games to speed up the rate of play. The Seventh Circuit held that the speeded-up version of Galaxian was a derivative work. *Id.* at 1013–14. Artic's chip substantially copied and *replaced* the chip that was originally distributed by Midway. Purchasers of Artic's chip also benefited economically by offering the altered game for use by the general public. The Game Genie does not physically incorporate a portion of a copyrighted work, nor does it supplant demand for a component of that work. The court in *Midway* acknowledged that the Copyright Act's definition of "derivative work" "must be stretched to accommodate speed-ed-up video games." *Id.* at 1014. Stretching that definition further would chill innovation and fail to protect "society's competing interest in the free flow of ideas, information, and commerce." *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984).

In holding that the audiovisual displays created by the Game Genie are not derivative works, we recognize that technology often advances by improvement rather than replacement. *See* Christian H. Nadan, Note, *A Proposal to Recognize Component Works: How a Teddy Bears on the Competing Ends of Copyright Law*, 78 Cal.L.Rev. 1633, 1635 (1990). Some time ago, for example, computer companies began marketing spell-checkers that operate within existing word processors by signalling the writer when a word is misspelled. These applications, as well as countless others, could not be produced and marketed if courts were to conclude that the word processor and spell-checker combination is a derivative work based on the word processor alone. The Game Genie is useless by itself, it can only enhance, and cannot duplicate or recast, a Nintendo game's output. It does not contain or produce a Nintendo game's output in some concrete or permanent form, nor does it supplant demand for Nintendo game cartridges. Such innovations rarely will constitute infringing derivative works under the Copyright Act. *See generally* Nadan, *supra*, at 1667–72.

### 2. *Fair use*

"The doctrine of fair use allows a holder of the privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner." *Narell v. Freeman*, 872 F.2d 907, 913 (9th Cir.1989) (citations omitted). The district court concluded that, even if the audiovisual displays created by the Game Genie are derivative works, Galoob is not liable under 17 U.S.C. § 107 because the displays are a fair use of Nintendo's copyrighted displays. "Whether a use of copyrighted material is a 'fair use' is a mixed question of law and fact. If the district court found sufficient facts to evaluate each of the statutory factors, the appellate court may decide whether defendants may claim the fair use defense as a matter of law." *Abend v. MCA, Inc.*, 863 F.2d 1465, 1468 (9th Cir.1988), *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990).

Section 107 codifies the fair use defense: In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; ·

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The factors are nonexclusive, *see Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir.1986), and section 107 does not indicate how much weight should be ascribed to each.

■ Much of the parties' dispute regarding the fair use defense concerns the proper focus of the court's inquiry: (1) Galoob or (2) consumers who purchase and use the Game Genie. Nintendo's complaint does not allege direct infringement, nor did it try the case on that theory. The complaint, for example, alleges only that "Galoob's marketing advertising [sic], promoting and selling of Game Genie has and will *contribute to* the creation of infringing derivatives of Nintendo's copyrighted ... games." (emphasis added). Contributory infringement is a form of third party liability. *See* Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 12.04[A][2], at 12–68 (1991). The district court properly focused on whether consumers who purchase and use the Game Genie would be infringing Nintendo's copyrights by creating (what are now assumed to be) derivative works.

Nintendo emphasizes that the district court ultimately addressed its direct infringement by authorization argument. The court concluded that, "[b]ecause the Game Genie does not create a derivative work when used in conjunction with a copyrighted video game, Galoob does not 'authorize the use of a copyrighted work without the actual authority from the copyright owner.'" *Galoob*, 780 F.Supp. at 1298 (quoting *Sony*, 464 U.S. at 435 n. 17, 104 S.Ct. at 785 n. 17). Although infringement by authorization is a form of direct infringement, this does not change the proper focus of our inquiry; a party cannot authorize another party to infringe a copyright unless the authorized conduct would itself be unlawful. ·

Nintendo disputes this conclusion. According to Nintendo, a party can unlawfully authorize another party to use a copyrighted work even if that party's use of the work would not violate the Copyright Act. Nintendo's argument is unpersuasive. In *Sony*, 464 U.S. at 449, 104 S.Ct. at 792, for example, the Court considered whether *consumers* were using the Betamax for a commercial or noncommercial purpose even though Sony itself obviously was acting in its own commercial self-interest. Professor Nimmer similarly concludes that, "to the extent that an activity does not violate one of those five enumerated rights [*see* 17 U.S.C. § 106], authorizing such activity does not constitute copyright infringement." 3 *Nimmer on Copyright* § 12.04[A][3][a], at 12–80 n.82.

■ The district court concluded that "a family's use of a Game Genie for private home enjoyment must be characterized as a non-commercial, nonprofit activity." *Galoob*, 780 F.Supp. at 1293. Nintendo argues that Game Genie users are supplanting its commercially valuable right to make and sell derivative works. Nintendo's reliance on *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985), is misplaced. The commercially valuable right at issue in *Harper & Row* was the right of first publication; Nation Enterprises intended to publish the copyrighted materials *for profit. See id.* at 562–63, 105 S.Ct. at 2231–32. *See also Sony*, 464 U.S. at 449, 104 S.Ct. at 792 ("If the Betamax were used to make copies for a commercial or profit-making purpose, such use would presumptively be unfair."). Game Genie users are engaged in a non-profit activity. Their use of the Game Genie to create derivative works therefore is presumptively fair. *See Sony*, 464 U.S. at 449, 104 S.Ct. at 792.

The district court also concluded that "[t]he [Nintendo] works' published nature supports the fairness of the use." *Galoob*, 780 F.Supp. at 1293. Nintendo argues that it has not published the derivative works created by the Game Genie. This argument ignores the plain language of section 107: "the factors to be considered shall include ... the nature of the *copyrighted* work." The argument also would make the fair use defense unavailable in all cases of derivative works, including "criticism, comment, news reporting, teaching ..., scholarship, or research." 17 U.S.C. § 107. A commentary that incorporated large portions of *For Whom the Bell Tolls*, for

example, would be undeserving of fair use protection because the incorporated portions would constitute an unpublished derivative work. This cannot be the law.

■ The district court further concluded that the amount of the portion used in relation to the copyrighted work as a whole "cannot assist Nintendo in overcoming the presumption of fair use." *Galoob*, 780 F.Supp. at 1293. The video tape recorders at issue in *Sony* allowed consumers to tape copyrighted works in their entirety. The Supreme Court nevertheless held that, "when one considers ... that [video tape recording] merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use." 464 U.S. at 449–50, 104 S.Ct. at 792 (citations omitted). Consumers are not invited to witness Nintendo's audiovisual displays free of charge, but, once they have paid to do so, the fact that the derivative works created by the Game Genie are comprised almost entirely of Nintendo's copyrighted displays does not militate against a finding of fair use.

Nintendo would distinguish *Sony* because it involved copying copyrighted works rather than creating derivative works based on those works. In other words, the consumers in *Sony* could lawfully copy the copyrighted works because they were invited to view those works free of charge. Game Genie users, in contrast, are not invited to view derivative works based on Nintendo's copyrighted works without first paying for that privilege. *Sony* cannot be read so narrowly. It is difficult to imagine that the Court would have reached a different conclusion if Betamax purchasers were skipping portions of copyrighted works or viewing denouements before climaxes. *Sony* recognizes that a party who distributes a copyrighted work cannot dictate how that work is to be enjoyed. Consumers may use a Betamax to view copyrighted works at a more convenient time. They similarly may use a Game Genie to enhance a Nintendo Game cartridge's audiovisual display in such a way as to make the experience more enjoyable.

■ "The fourth factor is the 'most important, and indeed, central fair use factor.'" *Stewart*, 495 U.S. at 238, 110 S.Ct. at 1769 (quoting 3 *Nimmer on Copyright* § 13.05[A], at 13–81). The district

court concluded that "Nintendo has failed to show any harm to the present market for its copyrighted games and has failed to establish the reasonable likelihood of a potential market for slightly altered versions of the games at suit." *Galoob*, 780 F.Supp. at 1295. Nintendo's main argument on appeal is that the test for market harm encompasses the potential market for derivative works. Because the Game Genie is used for a noncommercial purpose, the likelihood of future harm may not be presumed. *See Sony*, 464 U.S. at 451, 104 S.Ct. at 793. Nintendo must show "by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Id.* (emphasis supplied).

Nintendo's argument is supported by case law. Although the Copyright Act requires a court to consider "the effect of the use upon the potential market for or value of the *copyrighted work*," 17 U.S.C. § 107(4) (emphasis added), we held in *Abend* that "[a]lthough the motion picture will have no adverse effect on bookstore sales of the [underlying] novel—and may in fact have a beneficial effect—it is 'clear that [the film's producer] may not invoke the defense of fair use.'" 863 F.2d at 1482 (quoting 3 *Nimmer on Copyright* § 13.-05[B], at 13–84). We explained: "'If the defendant's work adversely affects the value of any of the rights in the copyrighted work ... the use is not fair even if the rights thus affected have not as yet been exercised by the plaintiff.'" *Id.* (quoting 3 *Nimmer on Copyright* § 13.05[B], at 13–84 to 13–85 (footnotes omitted)). The Supreme Court specifically affirmed our finding that the motion picture adaptation "impinged on the ability to market new versions of the story." *Stewart*, 495 U.S. at 238, 110 S.Ct. at 1769.

Still, Nintendo's argument is undermined by the facts. The district court considered the potential market for derivative works based on Nintendo game cartridges and found that: (1) "Nintendo has not, to date, issued or considered issuing altered versions of existing games," *Galoob*, 780 F.Supp. at 1295, and (2) Nintendo "has failed to show the reasonable likelihood of such a market." *Id.* The record supports the court's findings. According to Stephen Beck, Galoob's expert witness, junior or expert versions of existing Nintendo games would enjoy very little market interest because the original version of each game already has been designed to appeal to the largest number of consumers. Mr. Beck

also testified that a new game must include new material or "the game player is going to feel very cheated and robbed, and [the] product will have a bad reputation and word of mouth will probably kill its sales." Howard Lincoln, Senior Vice President of Nintendo of America, acknowledged that Nintendo has no present plans to market such games.

The district court also noted that Nintendo's assertion that it may wish to re-release altered versions of its game cartridges is contradicted by its position in various other lawsuits:

> In those actions, Nintendo opposes antitrust claims by using the vagaries of the video game industry to rebut the impact and permanence of its market control, if any. Having indoctrinated this Court as to the fast pace and instability of the video game industry, Nintendo may not now, without any data, redefine that market in its request for the extraordinary remedy sought herein.... While board games may never die, good video games are mortal.

*Galoob*, 780 F.Supp. at 1295. The existence of this potential market cannot be presumed. *See Sony*, 464 U.S. at 451, 104 S.Ct. at 793. *See also Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir.1991) (affirming district court's finding of no reasonable likelihood of injury to alleged market because "[p]laintiff has offered no evidence that the project will go forward"). The fourth and most important fair use factor also favors Galoob.

 Nintendo's most persuasive argument is that the creative nature of its audiovisual displays weighs against a finding of fair use. The Supreme Court has acknowledged that "fair use is more likely to be found in factual works than fictional works." *Stewart*, 495 U.S. at 237, 110 S.Ct. at 1769. This consideration weighs against a finding of fair use, but it is not dispositive. *See Sony*, 464 U.S. at 448, 104 S.Ct. at 792 (fair use defense is an "equitable rule of reason"). The district court could properly conclude that Game Genie users are making a fair use of Nintendo's displays.

### 3. *Temporary and permanent injunction*

Galoob has not violated the Copyright Act. Nintendo therefore is not entitled to a temporary or permanent injunction.

AFFIRMED.

RYMER, Circuit Judge, concurring in the judgment:

I concur in the judgment for reasons stated by the district court, *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F.Supp. 1283 (N.D.Cal.1991).